IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 24, 2011 Session[1]

## CHARLES ROACH AND JOYCE ROACH
### v.
## DIXIE GAS COMPANY; BEN THOMAS WILLIAMS, JR., INDIVIDUALLY AND AS OWNER AND MANAGER OF DIXIE GAS COMPANY; SEMSTREAM, L.P.; SANTIE WHOLESALE OIL COMPANY, A DIVISION OF BLUE RHINO RELIABLE PROPANE; AND JOHN DOES 1 THROUGH 10

An Appeal from the Circuit Court for Hardeman County
No. 06-02-0140    J. Weber McCraw, Judge

_____

No. W2010-01496-COA-R3-CV - Filed November 14, 2011

_____

This lawsuit for damages arises out of an explosion. The plaintiff customers went to the defendant propane gas facility to fill their recreational vehicle with propane. Soon after they arrived, one of the propane hoses began to leak, and propane gas vapor began to envelope the premises. After a short period of time, the propane gas tank exploded, causing devastating property damage and destroying the plaintiffs' recreational vehicle. The plaintiffs filed this lawsuit against the defendants, alleging that they were near the explosion site when the explosion occurred, and that the explosion caused them numerous physical and psychological injuries. The defendants admitted liability and compensated the plaintiffs for their property damage. The defendants claimed, however, that the plaintiffs were not present at the explosion site when the explosion occurred and did not sustain any personal injuries

[1]After oral argument in this cause, the Court asked the parties to submit supplemental briefs on the issue of whether Tenn. R. Civ. P. 35 requires an appointed medical examiner to be "independent," and the Court considered the appeal after the filing of the supplemental briefs.

To say that the appellate record in this case was problematic is an understatement. The record, consisting of 10,578 pages in 66 volumes, had little organization. The Circuit Court Clerk specifically noted numerous problems necessitating the return of various transcripts and exhibits for correction. The transcripts and exhibits had no index. The only table of contents for the entire 10,000 plus page record listed documents *alphabetically*, which is of little use due to the innumerable ways in which a given document may be titled, and gives the page number, without reference to the volume. Such almost random organization in a record of this size necessitates an undue amount of judicial time. We note that caselaw from this Court consistently holds that the appellant is charged with providing the appellate court with a record that will enable the Court to adequately consider the issues raised on appeal.

caused by the explosion. After a jury trial, the jury returned a verdict in favor of the defendants, determining that the explosion did not cause any personal injuries to the plaintiffs and awarding zero damages. The plaintiffs now appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Edward M. Bearman, Memphis, Tennessee, for the Plaintiff/Appellants Charles Roach and Joyce Roach

John V. McCoy and Eugene M. LaFlamme, Waukesha, Wisconsin; and Kenneth R. Rudstrom, Memphis, Tennessee, for the Defendant/Appellees Dixie Gas Company and Benjamin Thomas Williams, Jr.

## OPINION

### FACTS AND PROCEEDINGS BELOW

### Background

Defendant/Appellee Dixie Gas Company ("Dixie Gas") is a retail propane business on Highway 125 in Bolivar, Tennessee. Dixie Gas is owned by Defendant/Appellee Benjamin Thomas Williams, Jr. ("Mr. Williams").

On April 22, 2005, Plaintiff/Appellants Charles Roach ("Mr. Roach") and his wife, Joyce Roach ("Mrs. Roach"), then 56 years old and 54 years old respectively, visited Dixie Gas to buy propane for their recreation vehicle ("RV"). Mr. Roach went into the Dixie Gas office to get assistance, while Mrs. Roach stayed in or near the RV. When Mr. Roach went inside, a Dixie Gas employee, Mary Gomez ("Ms. Gomez"), was in the office talking on the telephone.

While Mr. Roach waited for Ms. Gomez to finish her telephone conversation, he heard a loud noise. The noise turned out to be the rupture of a hose on the propane tank near the Roaches' RV. Mr. Roach went outside the Dixie Gas office and saw a vapor cloud beginning to envelope the RV and a stream of liquid propane flowing from the propane bulk storage unit. The events that followed in the next several minutes are the subject of sharp dispute between the parties.

According to the Roaches, Mr. Roach told Ms. Gomez to call 911 and to flee. Ms. Gomez ran from the facility. Mr. Roach then realized that Mrs. Roach was still in their RV, which by then was engulfed in the dense gray vapor cloud from the leaking propane gas. He found Mrs. Roach in a semi-conscious state inside the RV and either pulled her out or urged her to get herself out. Once out of the RV, the Roaches began to run away from the worsening scene. As they neared the front gate at the entrance of the facility on Highway 125, the leaking propane ignited, causing a huge explosion. The explosion blew the roof off of the Dixie Gas office, causing it to rise some thirty feet in the air. The pressure wave from the explosion knocked Mr. and Mrs. Roach to the ground. The Roaches picked themselves up off the ground and again began running. As they ran, Mr. Roach saw fire trucks down the road, backing up, but did not see fire trucks at the entrance gate. Mr. and Mrs. Roach made their way to a ditch behind a nearby mobile home. As they sheltered in the ditch, a second explosion occurred, so loud that Mr. Roach put his hands over Mrs. Roach's ears to shield them.

The initial explosions triggered the explosion of numerous smaller canisters of propane gas on the Dixie Gas property.[2] Fire department personnel then backed away from the scene, concerned about the flying propane gas canisters. Mr. and Mrs. Roach remained in the nearby ditch for some time, and when the explosions subsided, they ran into the woods to get further away. When they exited the woods, they came upon a nearby homeowner who called the Roaches' friend, their insurance agent, to come and pick up Mr. and Mrs. Roach. The insurance agent friend arrived shortly thereafter and took the Roaches home. The Roaches' RV was left on the Dixie Gas premises, destroyed by the propane gas explosions and fire.

The Roaches did not immediately report any injuries from the incident. However, they later claimed that they suffered substantial physical and psychological injury as a result of the incident, including hearing loss, tinnitus,[3] speech disorder,[4] vertigo, post traumatic stress disorder ("PTSD"), and depression. About two months after the explosion incident, Mr. and Mrs. Roach sought medical treatment for these injuries. Mr. Roach claimed that his injuries from the incident completely disabled him from working and cost him millions of dollars in potential earnings.

---

[2]The small canisters were referred to as "grill" canisters, as for a backyard barbeque grill.

[3]Tinnitus is sometimes referred to as a "ringing" in the ears. One expert defined "tinnitus" as "a noise heard in one or both of your ears that is not present in your environment. In other words, you are hearing it but it is not in your environment."

[4]Mr. Roach said that he developed a vocal pattern abnormality referred to in the record as "baby talk."

Dixie Gas had a sharply contrasting view of the events. Dixie Gas acknowledged that the propane gas leak occurred, that Mr. and Mrs. Roach were on the Dixie Gas premises when the leak began, and that the ensuing explosions destroyed the Roaches' RV. However, Dixie Gas maintained that, by the time the explosions occurred, Mr. and Mrs. Roach were no longer on or near the Dixie Gas property, but had fled to a safe distance away from the scene, several minutes before the explosion. Therefore, Dixie Gas denied that the propane gas explosion caused Mr. and Mrs. Roach any personal injuries or any loss of income.

## Lawsuit

On April 19, 2006, the Roaches filed the instant lawsuit in the Circuit Court of Hardeman County, Tennessee, against Dixie Gas, Mr. Williams, individually and as the owner of Dixie Gas (collectively, "the Defendants"), and numerous other defendants.[5] The complaint alleged negligence by the Defendants and asserted that Mr. and Mrs. Roach suffered physical and emotional injuries as a result of the accident. The Defendants filed responses denying liability and disputing the damages claimed by the Plaintiffs. Extensive discovery ensued.

## Pretrial Matters

We recount only the pretrial proceedings that are pertinent to the issues raised on appeal. During discovery, the Roaches obtained testimony from four medical experts who testified by deposition that either Mr. Roach, Mrs. Roach, or both, sustained PTSD and depression as a result of the Dixie Gas explosion. The Plaintiffs' experts included a psychiatrist, a neurologist, a neuropsychologist, and a physician who specialized in preventive medicine. To rebut this evidence, the Defendants sought to use the expert testimony of a psychiatrist and a neuropsychologist. To inform the evaluations of these defense experts, the Defendants asked Mr. and Mrs. Roach to allow the psychiatrist and the neuropsychologist to evaluate them in person. They refused.

Consequently, on April 6, 2009, the Defendants filed a "Motion for Permission to Conduct a Rule 35.01 Examination on Plaintiffs," requesting permission for the defense psychiatrist to conduct psychiatric examinations on both Mr. and Mrs. Roach, and for the defense neuropsychologist to conduct a neuropsychological examination on Mr. Roach pursuant to

---

[5] Also named as defendants were Semstream, L.P., Santie Wholesale Oil Company, a division of Blue Rhino Reliable Propane, and John Does 1 through 10. The Roaches later amended their complaint to add Ferrellgas, Inc., d/b/a Blue Rhino; Ferrellgas, L.P.; Bryant Trucking, Inc.; and CHS Inc. as defendants. Summary judgment was granted in favor of most of these defendants, and they are no longer involved in this lawsuit. Although there is no order in the record dismissing Ferrellgas, Inc., d/b/a Blue Rhino, or John Does 1 through 10, the parties have represented to this Court that they have been dismissed from this lawsuit as well. There are no issues on appeal involving any defendants other than Dixie Gas and Mr. Williams.

Rule 35 of the Tennessee Rules of Civil Procedure. In support of this motion, the Defendants submitted the affidavits of the psychiatrist and the neuropsychologist, stating that an in-person medical/neurological examination of Mr. and Mrs. Roach was necessary for them to evaluate the extent of their injuries, if any. In opposition to the motion, the Roaches argued that the facts did not justify compelling them to submit to a medical examination by the Defendants' experts, and that it was improper for a Rule 35 medical examiner to have *ex parte* communications with counsel for either party prior to the examination because Rule 35 required the medical examiner to be "independent" of either party. In support of their response opposing the Defendants' Rule 35 motion, the Roaches submitted the affidavit of the Roaches' psychiatrist, stating that "having another person delve into this issue would be detrimental to Charles and Joyce Roach's already unstable psychological status." After a hearing, the trial court granted the Defendants' Rule 35 motion, finding that the mental and physical condition of both Mr. and Mrs. Roach had been placed "in controversy," and that the Defendants had shown good cause for the examinations.[6]

The Roaches also indicated that they intended to submit the testimony of an otolaryngologist, who treated Mr. and Mrs. Roach for their hearing-related problems. The Plaintiffs' otolaryngologist opined that the tinnitus and hearing loss that Mr. and Mrs. Roach suffered were caused by the Dixie Gas explosion. The Defendants sought to rebut this testimony with the testimony of another otolaryngologist, who opined that Mr. Roach's hearing loss and tinnitus was either non-existent or was not caused by the Dixie Gas explosion. The Roaches filed a motion *in limine* to exclude the testimony of the Defendants' otolaryngologist because he could not state to a "reasonable degree of medical certainty" what caused Mr. Roach's hearing loss. The trial court denied this motion.

## Trial

On January 19, 2010, the seven-day jury trial commenced. On the morning of trial, the Defendants stipulated to liability for the incident. They continued, however, to dispute causation and damages. Specifically, the Defendants maintained that the Plaintiffs were well away from the Dixie Gas premises by the time the first explosion occurred. Therefore, the issues remaining for trial were whether Mr. and Mrs. Roach were at the scene of the

---

[6]To prevent any appearance that these defense experts were being presented as "independent," the trial court granted the Roaches' motion *in limine* to bar the Defendants from referring to either their psychiatrist or their neuropsychologist as "independent" medical experts during the trial. This order also applied to another defense expert, an otolaryngologist.

explosion when it occurred, whether they suffered any damages from the explosion, and, if so, the extent of any such damages.[7]

### *Plaintiffs' Proof*

Mr. Roach was the first to testify. He described in vivid detail the events leading up to the first explosion: alerting Ms. Gomez to the propane gas leak and telling her to flee, the dense gas vapor surrounding their RV, finding his wife semi-conscious inside the RV, pulling her out, and both of them struggling to escape in time. Mr. Roach testified that he feared for his life, and believed "beyond a shadow of a doubt I [was] going to die." Mr. Roach testified that he and Mrs. Roach had made it nearly to the Dixie Gas entrance gate when the first explosion occurred. The force of the explosion, he said, knocked them both to the ground. When they managed to get up and pass the entrance gate, he did not see any fire trucks at the entrance, but saw fire trucks backing down the road. Mr. Roach described his wife and himself taking cover from the second large explosion in a ditch behind the mobile home of a neighbor across the street from Dixie Gas, with Mr. Roach covering his wife's ears to protect them. They stayed in the ditch until the explosions subsided. By the time they finally got home, Mr. Roach stated, he was soaked with propane, his ears were ringing badly, he had a headache, and he was nauseated.

In the weeks that followed the incident, Mr. Roach testified, he got almost no sleep and had repeated nightmares about the explosions. He suffered frequent nausea, frequent headaches, and a constant ringing in the ears. He became forgetful, such as forgetting to turn off a stove or running water. Mr. Roach experienced dizziness and developed balance problems and vertigo, and at times had to walk with a cane because of it. Mr. Roach said that he also developed an unusual speech disorder, referred to as "baby talk dysarthria," at times using agrammatic speech marked by errors in syntax and the omission of function words or connecting words, while at other times using normal, fluent speech.[8] Mr. Roach said that he

---

[7]The Defendants stipulated liability for the damage to the Roaches' RV and their other personal property that was destroyed in the accident. Consequently, evidence regarding the Roaches' property damage was not part of the trial.

[8]As later observed by the Plaintiffs' expert witness, neurologist Thomas C. Head, M.D., the unusual speech pattern displayed "variability," that is, was not consistent. This appears true in Mr. Roach's testimony. At times the speech pattern in the trial transcript appears normal, at other times it displayed the claimed disorder. For example, in describing his educational background, Mr. Roach testified:

> I continued education for several years. I be one of those individuals that have hard time, maybe lack of immaturity, have hard time ever decide what I would like to do for whole life. Whole life is long time.

(continued...)

also developed bowel incontinence, forcing his wife to stay close to him at all times and sometimes clean up after his fecal incontinence.

Mr. Roach explained that he did not seek medical treatment immediately after the explosion because "I not be no hypochondriac." Finally, some six weeks after the incident, Mr. Roach visited his general physician, Dr. James Thomas, M.D. ("Dr. Thomas"), about a swelling near his right ear that was unrelated to the propane gas explosion. Dr. Thomas referred him to an otolaryngologist, John J. Shea, Jr., M.D. ("Dr. Shea"). Dr. Shea was more concerned with the hearing loss, ear damage, and balance problems that Mr. Roach described than with the swelling near Mr. Roach's ear.

Mr. Roach also testified about his work history before the explosion. He stated that, for many years, he had worked in automobile sales as a business manager and as a special consultant. He then left the automobile industry to become an entrepreneur; among other things, he owned a business called Action Metal Products. After the explosion, Mr. Roach stated, he was unable to continue managing his business affairs, and he ultimately had to sell his ownership interest in his businesses. Mr. Roach described in detail that the physical and emotional problems resulting from the Dixie Gas explosion prevented him from working and from enjoying life, and that the explosion adversely affected his relationship with his wife. One year after the accident, Mr. Roach stated, he applied for and was awarded federal social security disability benefits.

On cross-examination, Mr. Roach was asked about notations in his medical records indicating that, prior to the Dixie Gas incident, he had complained of ringing in his ears and hearing loss, and that he declined to use hearing aids after the incident, even though his otolaryngologist, Dr. Shea, had advised that they could benefit him. Mr. Roach

---

[8](...continued)
In describing his tinnitus, Mr. Roach testified:

> My ears ringing so bad. I never comprehend what ear ring were before until then. And you don't know what ear ring is until it's block out you hearing somebody one day talk. But I knew what it was then.

In contrast, when Mr. Roach was asked on cross-examination to pinpoint where he was after the first explosion, his response was fluent and articulate:

> At the time of the explosion I was fleeing for my life and I didn't look to see who was where and really, not being facetious, that was the least thing that was upon my mind.

acknowledged that he had had some minimal pre-existing conditions, but he insisted that his diminished condition by the time of trial was different and was caused by the explosion. Mr. Roach also acknowledged that, prior to the Dixie Gas incident, he and Mrs. Roach experienced financial difficulties that resulted in foreclosure on their house and the filing of a bankruptcy petition. Mr. Roach claimed, however, that the foreclosure and bankruptcy did not appreciably affect his emotional condition, "didn't stress me a bit," because he knew he just needed time for things to work out. He insisted that the explosion was the cause of his depression and PTSD.

Mrs. Roach also testified at trial. Like Mr. Roach, she did not recall seeing the fire trucks at the Dixie Gas entrance when the explosion occurred, nor did she see anyone standing near the entrance. She corroborated Mr. Roach's testimony that, while they were fleeing Dixie Gas, "running for our life," as they reached the Dixie Gas entrance gate, they were knocked down by the explosion. She remembered them being in the ditch behind the home of the neighbor across the road from Dixie Gas and Mr. Roach trying to cover her ears to protect her. Mrs. Roach did not remember talking to the neighbor when she and Mr. Roach were behind the neighbor's house after the first explosion occurred. After that, they walked through the woods and ended up at the home of another neighbor, where they borrowed a telephone and called someone to pick them up.

After the explosion, Mrs. Roach said, she was "a nervous wreck." She said they both could not sleep, she had nightmares, they both were sick to their stomach, and Mr. Roach was throwing up. Both of them had ringing in their ears. When asked why she did not seek medical attention sooner than two months after the explosion, Mrs. Roach explained that she "just did not see the need to go" to a doctor because she thought her symptoms would get better. Instead, she said, they got worse. Mrs. Roach said that Mr. Roach's speech disorder did not begin until approximately two months after the accident. When asked about her remaining physical problems at the time of trial, Mrs. Roach testified that she still has ringing in her ears "24/7," as well as nightmares, sleeping problems, degenerative back problems, osteoporosis, nausea, and problems with balance. She admitted that before the Dixie Gas incident, she had only mild hearing loss, and had short episodes of ringing in her ears only if she had a sinus infection.

Mrs. Roach testified that the Dixie Gas explosion "destroyed" her husband. She said that Mr. Roach had become introverted and dependent to the point that he no longer left home without her. Mrs. Roach acknowledged that she and Mr. Roach had filed bankruptcy in 2003, but she said that she "just didn't worry" about their finances before the explosion, claiming that Mr. Roach could have "easily" earned $200,000 to $250,000 per year had he not become disabled as a result of the explosion.

The jury also heard testimony from Ms. Gomez, the Dixie Gas employee who was in the Dixie Gas office when the propane leak started. Ms. Gomez testified that, by the time she and Mr. Roach realized that the propane gas was leaking, Andy Williams, the son of Dixie Gas owner Mr. Williams, was on the scene. She said that he turned the electricity off and instructed Ms. Gomez to stay away from her van. Ms. Gomez, then fearing for her life, began to run away from Dixie Gas, and she called 911 on her way out. When she reached the highway, Ms. Gomez said, her son picked her up, and together they drove to a nearby church. When they got out of the car at the church, they heard the first explosion. Ms. Gomez said that, for about six weeks after the incident, she experienced a loss of hearing in one ear and a loss of her sense of smell, but those effects were only temporary and had subsided by the time of trial. She said that going through such a stressful situation caused her to have "various nervous breakdowns" and apprehension about being near propane for a while, but she indicated that she had no enduring negative effects from the explosion.

The 911 police dispatcher who received the call about the explosion, Marilyn Woody ("Ms. Woody"), testified that the first distress call came in at 2:11 p.m. Ms. Woody said that the fire department arrived on the scene at the Dixie Gas facility at approximately 2:13 p.m. The jury also heard testimony from a firefighter, Lieutenant Kim Knuckles ("Lt. Knuckles"), who testified that, after he received notice of the 911 call, it took him approximately two minutes to get to the fire station, and he arrived on the scene at Dixie Gas two and one-half minutes after that. By the time Lt. Knuckles' vehicle arrived at Dixie Gas, another fire truck was already there and firefighters were pulling fire hose off the truck. Lt. Knuckles stated that, after he had arrived and had taken just three steps away from the fire truck, a span of about thirty seconds, the first explosion occurred. From where he was standing, he felt the blast but was not injured. Lt. Knuckles did not see the Roaches on the Dixie Gas premises at the time of the blast.

The Roaches submitted the testimony of a homeowner who lived near Dixie Gas, Gregory Brian Diffey ("Mr. Diffey"). After leaving the ditch behind the mobile home across from Dixie Gas, the Roaches walked through the woods to Mr. Diffey's home and asked to use his telephone. Mr. Diffey testified that, when he saw the Roaches after the explosion, they appeared to be "shaken up" and in "total shock." Mr. Roach was talking loudly because he could not hear well, and Mr. Diffey had to help them use the telephone to call a friend to pick them up. Mr. Roach's clothes were tattered, and his face was red. The Roaches also proffered the testimony of the friend who came to pick them up after the explosion, insurance agent Kreg Hamm ("Mr. Hamm"). Mr. Hamm testified that, when he picked the Roaches up from Mr. Diffey's home, they were wide-eyed and "talking real loud, real fast." He described Mr. Roach as being "flustered, and addled."

As indicated above, the Roaches obtained the testimony and medical records from five medical professionals to support their damages claim.[9] The first was otolaryngologist John J. Shea, Jr., M.D. ("Dr. Shea"). Dr. Shea testified that Mr. and Mrs. Roach both suffered tinnitus and hearing loss from the explosion. Dr. Shea acknowledged that Mr. Roach had had some hearing loss prior to the explosion, but nevertheless was "confident" that Mr. Roach was near the explosion, and that the explosion made his preexisting hearing loss much worse. Psychiatrist Valerie Augustus, M.D. ("Dr. Augustus") treated Mr. Roach from October 2005 through November 2008, and treated Mrs. Roach from June 2007 through November 2008. From her treatment of Mr. and Mrs. Roach, Dr. Augustus concluded that they both suffered from PTSD and depression. Dr. Augustus was also confident that these psychiatric problems were caused by the Roaches being present at the Dixie Gas explosion. Dr. Augustus testified that, in order to have acquired PTSD, the Roaches need only have been near the vicinity of the explosion and felt that they were in danger; they did not have to actually have been in danger.

The Plaintiffs also presented testimony from two members of the Semmes-Murphey medical group: a neuropsychologist, Michael Anton, M.D. ("Dr. Anton"), and neurologist Thomas C. Head, M.D. ("Dr. Head"). Drs. Anton and Head both agreed with Dr. Augustus that the explosion caused the Roaches to suffer PTSD and depression. Dr. Anton did not express an opinion on Mr. Roach's "baby talk" speech disorder, but noted in his medical records that he had noticed that the unusual speech pattern was "variable," that is, used inconsistently, displayed prominently sometimes while other times Mr. Roach's speech was normal. Dr. Head expressed an opinion on Mr. Roach's "baby talk" speech disorder. He said that he had "never been able to fully explain" Mr. Roach's speech problem "except in the context of severe emotional and psychological distress" caused by the explosion. Dr. Head testified that he did not find any neurological deficits in Mr. Roach, and his records state that he could not explain Mr. Roach's "bizarre speech pattern" on "a neurological basis."[10]

_____

[9]According to the trial transcript, the video deposition of neurologist Thomas Head, M.D., was played for the jury, and a physician specializing in preventive medicine, Ray Garman, M.D., testified in person. The depositions of psychiatrist Valerie Augustus, M.D., neuropsychologist Michael Anton, M.D., and otolaryngologist John J. Shea, Jr., M.D., are included in the appellate record, but the Roaches do not cite in their brief where this testimony was read to the jury at trial. Nevertheless, the exhibits to the depositions of Dr. Augustus, Dr. Anton, and Dr. Shea, including their medical reports, were made exhibits at trial. Therefore, for purposes of this appeal, we will presume that the testimony of these doctors was considered by the jury in making their determination.

[10]In his medical records, Dr. Head noted that, inexplicably, Mr. Roach's "baby talk" speech disorder manifested not only in Mr. Roach's verbal communications, but also in his writing. For example, in his medical history, Mr. Roach was apparently asked to list medications prescribed to him by other physicians, and after listing one medicine prescribed by Dr. Thomas, Mr. Roach wrote, "Jim Thomas say life never get

(continued...)

-10-

The Plaintiffs also submitted the testimony of a physician specializing in environmental and preventive medicine, Ray Garman, M.D. ("Dr. Garman"). Dr. Garman testified that he treated Mr. Roach in November 2007, after the evaluations by Dr. Head and Dr. Anton, and he continued to see Mr. Roach through March 2009. After performing various tests on Mr. Roach, Dr. Garman opined that Mr. Roach suffered from PTSD and depression. He indicated that Mr. Roach's impairments, including the PTSD, depression, tinnitus, and hearing loss, were caused by the explosion, and that the explosion also caused Mr. Roach's speech problems. Although he was more concerned with Mr. Roach, Dr. Garman also saw Mrs. Roach three times beginning in November 2007. He found that she had tinnitus, but he did not have enough information to diagnose her otherwise.

The Plaintiffs also submitted evidence of the financial losses they contended resulted from the Dixie Gas explosion. They submitted the testimony of a vocational rehabilitation expert, Leon Tingle ("Mr. Tingle"). Mr. Tingle evaluated Mr. Roach in April 2006. He concluded that, given his communication problems, his hearing-related limitations, and his physical issues such as vertigo, Mr. Roach had no transferrable skill and was totally disabled from working. He agreed that, according to Dr. Shea's report, Mr. Roach would have benefitted from hearing aids but declined to get them.

The Plaintiffs also submitted the testimony of an economist, Larry Bates, Ph.D. ("Dr. Bates"), who testified as an expert about Mr. Roach's "income potential" lost because of his inability to work. Dr. Bates described Mr. Roach as an "entrepreneur." He looked at Mr. Roach's "potential" to earn income from age 57 to age 67. He concluded that Mr. Roach's lost economic potential over this period of time was over $4 million; specifically, $4,094,000.

### Defendants' Proof

The Defendants then called witnesses to testify about the events that occurred on the day of the explosion. The owner of Dixie Gas, Mr. Williams, 65 years old at the time of the incident, testified that his family's house is located on a hill just behind the Dixie Gas facility. On the day of the explosion, Mr. Williams was outside his house and heard the propane gas leak start. Immediately, Mr. Williams drove to the scene while his two adult sons ran down the hill to the Dixie Gas premises. Mr. Williams parked his car near the Roaches' RV, looked inside,

---

[10](...continued)
off," and after listing a medicine prescribed by Dr. Shea in Memphis, Mr. Roach wrote, "Dr. Shea say life no get off Memphis." There is no explanation in the record, from the Plaintiffs' experts or otherwise, as to how a speech disorder supposedly caused by exposure to a blast would manifest in a patient's written communications.

and found it to be empty. After locating the source of the propane gas leak, Mr. Williams and his sons determined that there was nothing they could do to stop it. About that time, Mr. Williams noticed Mrs. Roach approach her RV as if to get into it. Mr. Williams yelled "no" at her, to prevent her from entering the RV. Mr. Williams then saw Mr. Roach come around the back of the RV and put his hand on Mrs. Roach's shoulder, and they both turned and ran out the front gate of Dixie Gas. Mr. Williams then turned his attention back to checking the rest of the Dixie Gas property. He went into the Dixie Gas office, where he found a firefighter, one of his sons, and Ms. Gomez; all were leaving. Mr. Williams then got back in his car to leave himself. In scanning the property to see if anyone else was there, he saw two people across the road running away, but he was not certain whether it was the Roaches. Mr. Williams noticed the fire trucks at the front gate of Dixie Gas, with the firefighters pulling their lines. As he drove away, Mr. Williams testified, he saw the first explosion in his rear-view mirror. He said that the blast raised the roof of the Dixie Gas office about ten feet in the air.

Mr. Williams' adult sons, Andy and Benji Williams, also testified at trial. Both brothers, taking a lunch break at the Williams' home, heard the gas release sound of the propane gas leak and immediately ran from the home to the Dixie Gas premises. As Andy was at the Dixie Gas electricity shutoff, he saw the Roaches running away from the Dixie Gas property. He said that the Roaches were gone by the time the fire trucks arrived at the Dixie Gas front entrance and the firemen were laying out their fire hoses. As he was leaving the property on foot, Andy testified, the first explosion occurred with a "whoosh" sound. Both brothers jumped into a ditch at the end of the Dixie Gas property. Neither Andy nor Benji were injured from the explosion. Benji did not recall seeing the Roaches on the Dixie Gas premises. He said that he, his brother, and a firefighter were the last persons on the property before the explosion. When the explosion occurred, it moved Benji's shirt like a gust of wind, but did not knock him down. Benji estimated that some six minutes elapsed between the onset of the propane leak and the first explosion.

Andy testified that he met with the Roaches at Dixie Gas a few days after the accident so that the Roaches' insurance adjuster could look at what was left of the RV. At that meeting, they "commented to each other how happy we were that nobody got hurt." Mr. Roach and Mrs. Roach looked through the wreckage of the RV. Andy's mother, Janice Williams ("Mrs. Williams"), testified that she was not present at the time of the explosion, but she was present at the meeting at Dixie Gas a few days after the explosion when the Roaches returned to the scene. At that time, she told Mr. Roach that she was "really glad and so thankful that nobody was hurt or killed . . . ." In response, neither Mr. nor Mrs. Roach told her that they had been injured in the explosion.

The Defendants called several firefighters — John Baker, Marshall Lloyd Bell, and Chris Bell (Marshall's son) — to testify at trial. All testified that they arrived at the Dixie Gas facility before the first explosion occurred, and that they parked their trucks by the main entrance gate. Each firefighter testified that he did not see the Roaches while there, either on the Dixie Gas property or running away from the property. Firefighters Chris Bell and Marshall Bell both testified that, prior to the first explosion, they specifically made sure that everyone was off the Dixie Gas property. Firefighter John Baker testified that the first explosion occurred less than one minute after he arrived. None of the firefighters who testified were knocked down from the explosion, and none had any ringing in their ears or any other injuries from the explosion.

The jury viewed the video deposition of William Bruce Baker ("Mr. Baker"), who lived in a mobile home across the road from Dixie Gas at the time of the incident.[11] On that day in April 2005, Mr. Baker was outside his home watching the entire incident unfold. Mr. Baker said that the firefighters arrived about fifteen minutes after he first saw the smoke or vapor from the propane leak. Prior to the first explosion, Mr. Baker said, he saw two individuals whom he did not know running across the road toward his house. Mr. Baker claimed that the two individuals "said they was leaving; it was fixing to blow up over there." They then went up the hill behind Mr. Baker's home well before the first propane tank exploded. Mr. Baker estimated that approximately five minutes passed from the time he saw the individuals leave until the time of the first explosion. When Mr. Baker was asked whether the two individuals who spoke to him were Mr. and Mrs. Roach, he said that the individuals told him that "that RV that was over there [at Dixie Gas] was theirs," and the Roaches' RV was the only recreational vehicle on the Dixie Gas property at the time. Mr. Baker was outside when the first explosion occurred; he commented that the explosion "jarred the whole world" and knocked everything off of the walls of his mobile home. However, Mr. Baker was not knocked to the ground and suffered no personal injuries from the explosion.

The Defendants also introduced the testimony of their medical experts to rebut the Roaches' personal injury claims. The video deposition of otolaryngologist Mitchell Schwaber, M.D. ("Dr. Schwaber"), was played for the jury at trial. Dr. Schwaber examined Mr. Roach in August 2007 and reviewed Mr. Roach's medical records. He did not examine Mrs. Roach. After performing a series of tests on Mr. Roach, Dr. Schwaber testified that the tests showed definitely that Mr. Roach had no inner ear abnormality nor any other adverse medical condition that could have been caused by exposure to an explosion. He explained that an injury from an explosion does not result from the noise, it is caused by the force of the

---

[11]The Roaches raise an issue on appeal as to whether the trial court erred in permitting the Defendants to submit the deposition testimony of Mr. Baker, rather than compelling Mr. Baker to appear at trial to testify in person based on the hearsay rule. This issue is discussed below.

pressure wave from the blast. The pressure wave causes asymmetric hearing loss and a characteristic acoustic reflex pattern that Mr. Roach did not have.[12] The series of tests performed by Dr. Schwaber showed that Mr. Roach's eardrums and the muscles in his ears were normal, indicating that he had not been exposed to a forceful explosion.

As to Mr. Roach's claim of tinnitus or ringing in the ears, Dr. Schwaber concluded that Mr. Roach had some tinnitus in both ears, but that it was not severe and was not caused by a blast. Dr. Schwaber noted specifically that Mr. Roach's medical records showed that Mr. Roach complained of tinnitus several years before the incident at Dixie Gas. Dr. Schwaber also testified that he could find no physical explanation for the "baby talk" vocal pattern that Mr. Roach displayed, and said that it was not related to an ear abnormality.

The jury also viewed the video deposition of psychiatrist William Wolters, M.D. ("Dr. Wolters"). Dr. Wolters reviewed the medical records of Mr. and Mrs. Roach, the depositions of several of the Plaintiffs' medical experts, and examined both Mr. and Mrs. Roach. As to Mr. Roach, Dr. Wolters testified that, from his review of the evidence and his personal examination of Mr. Roach in May 2009, he was of the opinion that Mr. Roach was not suffering from PTSD. He noted that Mr. Roach first sought psychiatric treatment with Dr. Augustus in October 2005, several months after the Dixie Gas incident, and that Mr. Roach did not receive a diagnosis of PTSD until February 2007, almost two years after the incident. Dr. Wolters found that Mr. Roach suffered from some psychiatric issues, including elements of depression and anxiety, but said that the cause was unclear because Mr. Roach's complaints were inconsistent and unreliable, and because Mr. Roach had a history of financial and marital problems before the explosion. Dr. Wolters found, however, that Mr. Roach's presentation was not consistent with PTSD. He noted that most PTSD patients have an aversion to talking about the causative traumatic event; Mr. Roach, however, talked about the Dixie Gas explosion freely and often, and even said that he "felt good" talking about it. Mr. Roach told Dr. Wolters that he was experiencing delusional beliefs that the Defendants or their attorneys or big oil companies had shot his dog or accessed his computer or intended to kill him; Dr. Wolters said that delusions are not a symptom of PTSD. In fact, Dr. Wolters concluded that at least some of the symptoms claimed by Mr. Roach, such as the "baby talk" speech pattern, were at least in part purposeful:

> . . . [A]s to the complaints of poor memory, poor concentration, bowel incontinence, baby talk, paranoid delusions, I do not believe that these are symptoms of PTSD, but . . . they are symptoms of some conscious process or an unconscious process that he is demonstrating these symptoms. And what I

---

[12]Dr. Schwaber testified that Mr. Roach had bilateral symmetric hearing loss, typically associated with causes such as age, general noise exposure, or heredity.

-14-

mean by that is, the conscious process would be purposely produced such as the baby talk.  He --- he's at least in part purposely having that speech pattern.

Similarly, Dr. Wolters determined that Mrs. Roach's symptoms perhaps exhibited some signs of depression, but they did not bear out a diagnosis of PTSD, much for the same reasons as Mr. Roach.  Dr. Wolters opined that, like Mr. Roach,  Mrs. Roach's complaints of poor memory, poor concentration, and paranoid delusions were not the result of PTSD, but rather were "the result of conscious or unconscious production or feigning of signs or symptoms or related to another psychiatric cause not created by the Dixie Gas explosion."

The final medical expert testimony was the video deposition of clinical neuropsychologist Brad Lee Roper, Ph.D. ("Dr. Roper").  To assess Mr. Roach, Dr. Roper reviewed his medical records and the depositions of the Plaintiffs' medical experts, and he also examined Mr. Roach in May 2009 and administered a variety of tests to Mr. Roach. The tests included some specifically designed to differentiate between persons with legitimate problems and persons who are exaggerating or feigning problems.  Dr. Roper stated that, from his review of the medical records and other evidence, and from his examination of Mr. Roach and the tests administered, Mr. Roach was not suffering from PTSD.  Dr. Roper opined that Mr. Roach's complaints, such as  loss of memory, attention, concentration, and other symptoms, were "clearly exaggerated," and in fact they were so exaggerated that "it was not possible for me to trust that . . . he was actually having these symptoms."  Like Dr. Wolters, Dr. Roper believed that the "baby talk" speech pattern exhibited by Mr. Roach had no neurological basis, but instead was conscious and exaggerated.  He believed that Mr. Roach was exaggerating his symptoms for "the obvious secondary gain [in] the ongoing lawsuit."  Dr. Roper found that Mr. Roach had major depressive disorder and conversion disorder,[13] which were psychological and not neurological in nature, but Dr. Roper was not able to determine the severity of these conditions because Mr. Roach had so exaggerated the intensity and frequency of his symptoms.

Finally, to rebut the economic conclusions of the Plaintiffs' economist, Dr. Bates, the Defendants proffered the testimony of William Robert Vance ("Mr. Vance"), a forensic accountant and business evaluation analyst.  To prepare his analysis, Mr. Vance reviewed the Roaches' pre-April 2005 tax returns, their bankruptcy documents, and their business records, as well as Dr. Bates' report.  Mr. Vance noted that the Roaches' business ventures in the three-year period prior to the Dixie Gas incident had continually lost money.  Mr. Vance was sharply critical of Dr. Bates' "economic potential" projection that, were it not for the Dixie

---

[13] Dr. Roper explained that a conversion disorder is "a psychological reaction that plays itself out some way in the body."  Mr. Roach's speech problem, he stated, was consistent with a conversion disorder, although the problem was exaggerated by Mr. Roach.

Gas explosion, Mr. Roach could have made $325,000 in 2006. He explained that, in 2005, the Roaches' tax returns showed that the had a loss of $27,000 for the year, and that "[t]o go from losing $27,000 in '05 to making [$325,000] in '06, absolutely does not add up. . . . [Mr. Roach has] never made that much money ever in his life in one year." Referring to Dr. Bates' assertion that the Roaches had lost some $4 million in "economic potential," Mr. Vance characterized it as "a ludicrous claim." From reviewing all of the Roaches' records, Mr. Vance concluded that the Roaches' "economic loss is zero."

### *Jury Verdict*

At the conclusion of trial, the jury returned a unanimous verdict in favor of the Defendants. The jury found that the April 22, 2005 Dixie Gas incident did not cause any injuries or damages to Mr. and Mrs. Roach, and consequently it awarded zero damages. The Roaches filed a motion for a new trial, arguing that the evidence presented at trial preponderated against the jury's verdict. That motion was denied. The Roaches now appeal.

### Issues on Appeal and Standard of Review

On appeal, the Roaches raise the following issues:

> 1. Whether the trial court erred in allowing the Rule 35 medical examinations by Dr. Wolters and Dr. Roper?
> 2. Whether the trial court erred in allowing the testimony of Dr. Schwaber?
> 3. Whether the trial court erred in allowing the testimony of William Bruce Baker by deposition, rather than compelling him to testify in person?
> 4. Whether the jury verdict awarding zero damages is supported by the weight of the evidence?
> 5. Whether the trial court erred in rejecting the Roaches' motion for a new trial?

Trial courts enjoy wide discretion in determining whether to order a Rule 35 medical examination. *Odom v. Odom*, No. M1999-02811-COA-R3-CV, 2001 WL 1543476, at *5 (Tenn. Ct. App. Dec. 5, 2001). Therefore, to the extent that the trial court's decision to allow the Rule 35 examinations by Dr. Wolters and Dr. Roper was discretionary, we review that decision for an abuse of discretion. The issue of whether a medical professional designated under Rule 35 is required to be "independent" is a question of law, which we review *de novo* on the record, with no presumption of correctness in the trial court's decision. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

-16-

Generally, "[t]rial courts in Tennessee are vested with broad discretion in determining the admissibility, qualifications, and competency of expert testimony." ***Taylor ex rel. Gneiwek v. Jackson-Madison County Gen. Hosp. Dist.***, 231 S.W.3d 361, 365 (Tenn. Ct. App. 2006). Therefore, we review the trial court's admission of Dr. Schwaber's testimony for an abuse of discretion.

Likewise, a trial court has considerable discretion in determining whether a witness is unavailable for trial pursuant to Rule 804, and we will not overturn a trial court's ruling on unavailability absent an abuse of that discretion. ***See Hicks v. State***, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972); ***see also Wilkes v. Fred's Inc.***, No. W2001-02393-COA-R3-CV, 2002 WL 31305202, at *5 (Tenn. Ct. App. Aug. 20, 2002). Therefore, we will also review the trial court's decision to permit Mr. Baker to testify by deposition, rather than requiring him to testify in person, for an abuse of discretion.

Regarding the Roaches' challenge to the jury's verdict, Rule 13(d) of the Tennessee Rules of Appellate Procedure states that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). Where a motion for a new trial asserts that the verdict was contrary to the weight of the evidence, it is the duty of the trial judge to weigh the evidence as the "thirteenth juror," to determine whether the evidence preponderates against the verdict and, if so, to grant a new trial. ***Overstreet v. Shoney's, Inc.***, 4 S.W.3d 694, 717 (Tenn. Ct. App. 1999). Once the trial court has approved the verdict and denied the motion for a new trial, this Court must affirm the verdict if the record contains any material evidence to support it. ***Washington v. 822 Corp.***, 43 S.W.3d 491, 493-94 (Tenn. Ct. App. 2000).

> When addressing whether there is material evidence to support a verdict, an appellate court shall: (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence. ***Crabtree Masonry Co. v. C & R Constr.***, Inc., 575 S.W.2d 4, 5 (Tenn. 1978); ***Black v. Quinn***, 646 S.W.2d 437, 439-40 (Tenn. App. 1982). Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies. If the record contains "any material evidence to support the verdict, [the jury's findings] must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury." ***Crabtree Masonry Co.***, 575 S.W.2d at 5.

***Whaley v. Perkins***, 197 S.W.3d 665, 671 (Tenn. 2006) (quoting ***Barnes v. Goodyear Tire & Rubber Co.***, 48 S.W.3d 698, 704-05 (Tenn. 2000)). "[W]e must . . . determine whether the trial court properly reviewed the evidence and agreed or disagreed with the verdict. We

cannot review the accuracy of the trial court's determination as thirteenth juror." ***Overstreet***, 4 S.W.3d at 717-18 (citations omitted).

## ANALYSIS

### Rule 35 Examinations

The Roaches argue that the trial court erred in granting the Defendants' Rule 35 motion under Rule 35 of the Tennessee Rules of Civil Procedure to permit defense experts Dr. Wolters and Dr. Roper to perform examinations on Mr. and Mrs. Roach. Rule 35.01 provides:

> When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is *in controversy*, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in custody or legal control. The order may be made only on motion *for good cause shown* and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

Tenn. R. Civ. P. 35.01 (emphasis added). Thus, where a party seeks an order requiring another party to submit to a physical or mental examination, Rule 35 requires the moving party to establish: (1) that a party's mental or physical condition is "in controversy," and (2) that "good cause" for the medical examination exists. ***See Overstreet v. TRW Commercial Steering Div.***, 256 S.W.3d 626, 638 (Tenn. 2008); *abrogated on other grounds*, ***Hays v. Am. Zurich Ins. Co.***, No. E2010-00099-WC-R3-WC, 2011 WL 2039402, at \*6 (Tenn. Workers Comp. Panel, May 25, 2011). "Once the moving party establishes a mental or physical condition 'in controversy' and 'good cause,' the rule gives the trial court discretion to order a medical examination." ***Id.*** The "in controversy" and "good cause" requirements of this rule balance "the interest of personal privacy with the interest of truth and justice." ***Id.*** ("Any type of physical or mental examination entails an invasion of privacy."). "Few precedents construing Tenn. R. Civ. P. 35 exist because physical and mental examinations of parties or persons in the custody of a party are usually done by agreement without the intervention of the courts." ***Odom***, 2001 WL 1543476, at \*5 (citing 4 Nancy F. MacLean, *Tennessee Practice* § 35:2 (3d ed. 2000)). When parties do not reach an agreement on the matter, however, a request for a medical exam may be made pursuant to Rule 35.

In this appeal, the Roaches argue that the trial court erred in granting the Defendants' Rule 35 motion because the Defendants did not establish that either the Plaintiffs' mental condition

or their physical condition was "in controversy," and that the Defendants did not show "good cause" for compelling them to undergo further examination. The Roaches also argue that compelling them to submit to medical examinations by defense psychiatrist Dr. Wolters and by defense neuropsychologist Dr. Roper were improper, because those experts were not "independent" medical examiners as required by Rule 35. Instead, both experts communicated with counsel for the Defendants *ex parte* on several occasions, both before and after conducting the medical examination of Mr. and Mrs. Roach. The Roaches assert that the Defendants also provided both experts with selective information about the case prior to their examination of Mr. and Mrs. Roach, without allowing the Roaches to give the experts their own information, in order to ensure that the experts received a clear and fair representation of the evidence. Under these circumstances, the Roaches argue, the Rule 35 motion to compel a physical and mental examination should have been denied.

We first address whether the "in controversy" requirement was met in this case. A party's physical or mental condition may be placed "in controversy" by a plaintiff by filing a complaint seeking damages for physical injuries or emotional distress. *Odom*, 2001 WL 1543476, at \*6 & n.7. In the case at bar, the complaint explicitly states that both Mr. Roach and Mrs. Roach suffered physical and mental injuries caused by the Defendants, and seeks compensation for these types of injuries. Therefore, by the filing of their complaint, the Roaches placed their mental condition and their physical condition squarely "in controversy."

We next address whether "good cause" existed for the Rule 35 examinations. The "good cause" requirement "places the burden on the moving party to demonstrate that the requested examination is needed. It requires the court to consider whether the information sought is available through other discovery techniques and whether the available information is adequate." *Id.* at \*6. Applying the federal counterpart to Tennessee's Rule 35, the United States Supreme Court has indicated that in some cases, the pleadings alone may be sufficient to establish "good cause" for a physical or mental examination.[14] See *Schlagenhauf v. Holder*, 379 U.S. 104 (1964), in which the Court observed: "A plaintiff in a negligence action who asserts mental or physical injury . . . places that mental or physical injury clearly in controversy and *provides the defendant with good cause for an examination* to determine the existence and extent of such asserted injury." *Schlagenhauf*, 379 U.S. at 119 (emphasis added).

Applying Tennessee's Rule 35 in *Odom*, the court gave examples of situations in which "good cause" is established, such as (1) when a party whose condition is in controversy has not yet

---

[14]Decisions of federal courts construing Federal Rule of Civil Procedure 35 can provide helpful guidance in interpreting Rule 35 of the Tennessee Rules of Civil Procedure. *See Odom*, 2001 WL 1543476, at \*5 n.6 (citing, *inter alia*, *Frazier v. East Tenn. Baptist Hosp.*, 55 S.W.3d 925, 928 (Tenn. 2001)).

undergone a medical examination; (2) when an examination has been done and medical records are available, but the conclusions of its own experts "is contrary to the opinion of the other experts"; (3) if the moving party's expert believes that the medical records are materially incomplete; or (4) if the moving party's expert disagrees with the methodology of the party whose condition is in controversy. **Odom**, 2001 WL 1543476, at *6.

In the instant case, Mr. and Mrs. Roach had already undergone numerous medical examinations. The Defendants' Rule 35 motion was based on the affidavits of Dr. Wolters and Dr. Roper stating that, after reviewing the medical records of the Mr. and Mrs. Roach, it was necessary for these experts to conduct their own examinations of Mr. and Mrs. Roach in order to determine the nature and extent of the Roaches' injuries. The affidavits indicated that it was possible that the diagnoses of these experts might differ from that of the Roaches' medical experts.

A trial court's decision on whether to grant a Rule 35 motion is "intensely fact-specific." **Id.** at *7. In light of the complaint filed by the Plaintiffs, and given the subjective nature of their claimed injuries, we find that the trial court did not err in determining that the "in controversy" and the "good cause" requirements of Rule 35 had been met.

Next, we address the Roaches' argument that the Rule 35 motion should have been denied because Dr. Wolters and Dr. Roper were not "independent" medical examiners. They point out that counsel for the Defendants engaged in extensive *ex parte* communications with both experts prior to the filing of their Rule 35 motion, establishing clearly that both were associated with the Defendants. The Roaches argue that an independent examination ordered under Rule 35 cannot be done by a defense expert who has reviewed the record and other evidence supplied by the defendant, citing **Overstreet**, 256 S.W.3d at 638-39, and **Ewing v. Ayres Corp.**, 129 F.R.D. 137 (N.D. Miss. 1989). In response, the Defendants maintain that Rule 35 contains no requirement that the medical examiner be "independent," and that, once the requirements of the Rule are met, the movant may choose his own physician to complete the Rule 35 examination. **See Newton v. Ceasar**, No. M2000-01117-COA-R10-CV, 2000 WL 863447 (Tenn. Ct. App. June 29, 2000).

The argument of the Plaintiffs on this issue was liberally sprinkled with the term "independent medical examiner" or IME, a term that has entered the popular legal lexicon. Indeed, in some cases, the trial court may choose to appoint its own objective, non-adversarial medial expert, as was done in a case cited by the Plaintiffs, **Ewing v. Ayres Corp.**, 129 F.R.D. 137 (N.D. Miss. 1989). In such a case, indeed in any case in which the trial court appoints its own expert, the trial court may seek to "preserve" the "independence" of the court's expert. **Id.** at 138. In other cases, the Rule 35 medical examination may be "independent" in the sense that it is not associated with, *i.e.* independent of, the other party's medical examiner. **See**

***Hammons v. Simmons***, No. 3:09CV-217-S, 2010 WL 3490994, at *1 (W.D. Ky. Aug. 31, 2010) (refusing to allow the plaintiff to call the Rule 35 independent medical examiner as a witness, because he was considered to be a consulting expert for the defendants).

Nevertheless, despite intermittent use of the term "independent" in connection with Rule 35, the word "independent" does not appear in the Rule itself.[15]  Rule 35 is broadly written, intended to govern the myriad situations in which a party's physical or mental state becomes an issue in litigation and the truth of the claims may be ascertained only by an examination of the party's body or mind.  Rule 35 requires only that the examination be done by a "suitably licensed or certified examiner."  Tenn. R. Civ. P. 35.01.  This Court in ***Newton***, on which the Defendants rely, stated that "the defendant's choice of physician [under Rule 35] should be honored in the absence of a valid objection by the plaintiff."  ***Newton***, 2000 WL 863447, at *2.  This rule is based on the well-established proposition that, so long as the plaintiff had the right to select his own doctor to testify as to his physical or mental condition, fundamental fairness demands that the defendant have the same right.   ***Id.*** (citing ***Timpte v. Dist. Ct. of Denver***, 421 P.2d 728 (Colo. 1966)); ***see*** Joseph E. Edwards, Annotation, *Right of a Defendant in Personal Injury Accident to Designate Physician to Conduct Medical Examination of Plaintiff*, 33 A.L.R.3d 1012 (1996), *cited in **Newton***, 2000 WL 863447, at *2; ***see also*** CHARLES ALAN WRIGHT, ET AL., 8B FEDERAL PRACTICE & PROCEDURE § 2234.2 (Updated Supp. 2011); ROBERT T. BANKS, JR., & JUNE F. ENTMAN, TENNESSEE CIVIL PROCEDURE § 8-12(b) (3d ed. 2009) (discussing ***Newton***).

The Plaintiffs also argue that, even if the Defendants are permitted to choose a Rule 35 medical examiner, it is nevertheless inappropriate for the defense to have *ex parte* communication with its chosen examiner, either before or after the examination.[16]  They assert

_____

[15] We note that the Plaintiffs' supplemental brief on this issue states: "The rule [Rule 35] uses the term 'independent.'  It must mean something or the term would not have been used."

[16] The Roaches claim that ***Overstreet v. TRW Commercial Steering Division*** provides support for their argument that *ex parte* communication with a Rule 35 medical examiner is prohibited.  ***Overstreet***, however, is inapplicable in this situation, because that case was decided under the workers' compensation statutes, which involve different considerations altogether.  We also conclude that ***Overstreet*** is inapplicable because the Court in that case held that it was improper for the defendant to have *ex parte* communications with the *plaintiff's treating physician*; it did not address whether the employer was entitled to have *ex parte* communications with the Rule 35 medical examiner.  ***See Overstreet***, 256 S.W.3d at 629-30.  Interestingly, the ***Overstreet*** Court held that, although the defendant could not contact the plaintiff's doctor, the trial court erred in declining to grant the employer's request for a Rule 35 independent medical examination "by a physician of the employer's choosing."  ***Id.*** at 639.  The Court reasoned that "[f]undamental fairness dictates that employers . . . have the opportunity to independently investigate the merits of a[n employee's] claim."  ***Id.***

that "the only contact that the Defense attorney should have with the Rule 35 examining physician is to set up an appointment and to pay the bill."

This argument is without merit. As noted above, litigation may necessitate a Rule 35 examiner under a number of circumstances, including the appointment of an independent examiner for the court. In such a situation, as was presented in *Ewing, supra*, the trial court may set the parameters for the parties' contacts with the examiner, at the court's discretion. Any such limitations, however, are not mandated by Rule 35. Indeed, it is difficult to envision how defense counsel would utilize a defense medical expert, or even establish the need for a Rule 35 examination, if counsel is not permitted to communicate with its chosen examiner. As discussed above, a party seeking to have a plaintiff submit to a medical examination under Rule 35 must establish "good cause" for a physical or mental examination of the other party. If the party at issue has already been examined, "good cause" is established with reference to the existing medical records by showing that they are incomplete, or that they reflect an opinion that is or may be contrary to the opinion of the Rule 35 examiner. *See Odom*, 2001 WL 1543476, at *6 (stating that "requests for examinations under [Rule 35] should be considered in the context of the other discovery in the case"); *see also Mitchell v. Iowa Interstate RR*, No. 07-1351, 2009 WL 2431590, at *2 (C.D. Ill Aug. 5, 2009); *A.H., ex rel. Hohe v. Knowledge Learning Corp.*, No. 09-2517-DJW, 2010 WL 4272844, at *2, *7 (D. Kan. Oct. 25, 2010); *Large v. Our Lady of Mercy Med. Ctr.*, No. 94 Civ. 5986(JGK)THK, 1998 WL 65995, at *6 (S.D.N.Y. Feb. 17, 1998). Without allowing the movant to give the Rule 35 examiner the existing medical records, the examiner could not meaningfully assess whether a further examination of the other party is necessary.

Therefore, we conclude that, once the requirements of Rule 35 have been met, a trial court has the discretion to compel a plaintiff to submit to a medical examination by a medical expert chosen by the defendant, and that the defendant and/or his counsel may have *ex parte* communication with that expert in preparation for the medical examination and for trial. In the instant case, we find that the Rule 35 requirements were met, and that the trial court did not abuse its discretion in ordering the medical examinations of the Roaches by Dr. Wolters and Dr. Roper.

## Admissibility of Medical Expert

The Roaches argue that the trial court erred in denying their motion *in limine* to exclude the expert testimony of otolaryngologist Dr. Schwaber at trial. In Dr. Schwaber's deposition, on cross-examination, he admitted that he did not have sufficient information about Mr. Roach's family history to know whether his hearing loss was due to heredity or long-term noise exposure. The Roaches argue that, because Dr. Schwaber admitted that he could not opine as to the cause of the Mr. Roach's problems to a reasonable degree of medical certainty, his

opinion lacks foundation, is speculative, would not assist the trier of fact, and therefore should have been excluded.

The admissibility of expert testimony is governed by Rule 702 of the Tennessee Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. Under this rule, medical testimony is admissible if it will "substantially assist the trier of fact." Medical testimony must be made to a necessary degree of certainty to prove causation. *Primm v. Wickes Lumber Co.*, 845 S.W.2d 768, 771 (Tenn. Ct. App. 1992); *see also Ambrose Bank v. Batsuk*, No. M2006-01131-COA-R3-CV, 2008 WL 1901207, at *5 (Tenn Ct. App. Apr. 30, 2008); *Hall v. Stewart*, No. W2005-02948-COA-R3-CV, 2007 WL 258406, at *6 (Tenn. Ct. App. Jan. 31, 2007). Thus, Rule 702 requires a trial court to determine (1) whether expert testimony will substantially assist a trier of fact in determining a fact in issue, and (2) whether the facts and data underlying the testimony indicate a lack of trustworthiness. *Hunter v. Ura*, 163 S.W.3d 686, 704 (Tenn. 2005). If a medical opinion is not made to a reasonable degree of medical certainty, it is considered to be overly speculative and not helpful to the trier of fact. *See Ambrose Bank*, 2008 WL 1901207, at *5; *Primm*, 845 S.W.2d at 771.

The Roaches' argument, however, ignores the fact that the Defendants did not offer Dr. Schwaber's testimony to establish an alternative theory of causation for Mr. Roach's tinnitus or his hearing loss. Rather, it was offered to rebut the Roaches' evidence of causation by showing that the tinnitus and hearing loss were *not* caused by the Dixie Gas explosion. The Roaches at all times had the burden to establish causation between the Defendants' negligence and their injuries; the Defendants were not required to establish an alternative cause in order to avoid liability. *See Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897, 901-02 (Tenn. Ct. App. 2002). Dr. Schwaber demonstrated that he had extensive medical qualifications and specialized knowledge: he is board certified in the field of otolaryngology, with a subspecialty in otology and neurotology. He explained in detail the tests that he performed on Mr. Roach and his conclusion, to a reasonable degree of medical certainty, that an explosion *did not* cause the problems about which Mr. Roach complained. Therefore, because Dr. Schwaber's testimony about causation, or the lack thereof, was made to a reasonable degree of medical certainty, it was not speculative, it assisted the trier of fact at trial, and it was admissible under Rule 702. The trial court did not abuse its discretion in denying the Roaches' motion *in limine* to exclude the testimony of Dr. Schwaber.

**Neighbor Testimony by Deposition**

At trial, the Defendants requested permission to submit the video deposition testimony of the neighbor across the road from Dixie Gas, William Bruce Baker, rather than requiring him to testify in person at trial. The request was made pursuant to Rule 804(a)(4) of the Tennessee Rules of Evidence, due to Mr. Baker's "physical or mental illness or infirmity."[17] The Defendants claimed that Mr. Baker was of advanced age ("at least in his seventies"), and that, after the Dixie Gas incident, Mr. Baker met with some adverse illnesses that made it difficult for him to leave his home. The Defendants pointed out that they "couldn't even get [Mr. Baker] across the street for a discovery deposition." As indicated above, the trial court granted the Defendants' request, and Mr. Baker's video deposition testimony was played for the jury at trial.[18]

On appeal, the Roaches argue that Mr. Baker did not qualify as being "unavailable" under Rule 804(a)(4). Although he was advanced in age, they argued, there is no evidence that he was physically or mentally infirm, so he could have traveled the short distance to the courthouse to testify at trial. In his deposition, Mr. Baker did not mention any particular illness that would have kept him from leaving his house; he only mentioned that he could not hear or see well. Therefore, the Roaches argue, allowing Mr. Baker to testify by video deposition with no evidence as to his physical infirmity constituted an abuse of discretion. The Roaches do not offer any evidence that Mr. Baker was fit for trial, and they did not inquire about his condition at his deposition. They do not explain how they were prejudiced by the trial court's decision, except to say in a conclusory fashion that it was not harmless error.

It is undisputed in the record that Mr. Baker is advancing in age. In his deposition, Mr. Baker testified that he was in "bad health." The Roaches did not seek to elicit any details on Mr. Baker's "bad health." From reviewing the record as a whole, we find that the Roaches have failed to show that the trial court abused its discretion in deferring to Mr. Baker and finding that he was physically infirm and, therefore, unavailable to appear at trial under Rule 804(a)(4).

---

[17]Rule 804(b) of the Tennessee Rules of Evidence provides an exception to the hearsay rule for former testimony given by the declarant if the declarant is "unavailable" as a witness at the time of trial. Rule 804(a)(4) states that a declarant is "unavailable" if he "is unable to be present or to testify at the hearing because of the declarant's death or then existing physical or mental illness or infirmity." *See* Tenn. R. Evid. 804(a), (b).

[18]The Plaintiffs' supplemental brief indicates that Mr. Baker's deposition was read to the jury, but the official trial transcript indicates that Mr. Baker's video deposition was played at trial.

**Weight of the Evidence**

The Roaches argue that the evidence at trial preponderated against the jury's verdict of "zero" damages caused by the Defendants, and that the verdict, therefore, should be reversed. They assert that (1) the Defendants stipulated to liability; (2) every physician who testified stated that the Roaches were injured in some way; (3) most, if not all, of the expert physicians testifying for the Defendants testified that the Dixie Gas explosion caused some injury to the Roaches; (4) all of the physicians who testified for the Roaches related their injuries to the incident; and (5) virtually all of the physicians who testified agreed that the explosion did or could have caused the Roaches some damages. They also point to the testimony of Dixie Gas employee Mary Gomez, vocational expert Leon Tingle, friend Kreg Hamm, and Dixie Gas neighbor Gregg Diffey as supporting their claim that they suffered at least some damage as a result of the explosion. Mr. and Mrs. Roach claim that evidence suggesting that the Roaches had gotten far away from the explosion scene before it ignited was impeached, and that the evidence showed that Mr. and Mrs. Roach did not have time to leave the scene before the first explosion. They characterize Mr. Baker's testimony, that Mr. and Mrs. Roach had been gone for approximately five minutes when the first explosion occurred, as "incorrect." The Roaches insist: "Certainly the evidence preponderates in favor of the Roaches suffering damages as a result of and caused by the explosion and therefore against the jury verdict."

At the outset, we note that the Roaches' argument is based on an erroneous standard of review. A jury verdict is not reviewed on appeal under a preponderance of the evidence standard. Rather, the jury verdict must be upheld if any material evidence supports it. *See Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009). In determining whether material evidence supports the verdict, "[a]ppellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704-05 (Tenn. 2000) (citing *Crabtree*, 575 S.W.2d at 5), *abrogated on other grounds*, *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010).

From a careful review of all of the evidence, including the entire trial transcript, we find that there is material evidence, indeed ample evidence, to support the jury's verdict of zero damages. Certainly Mr. and Mrs. Roach and their witnesses testified to a version of events that, if credited, could have resulted in a different verdict. The jury, of course, was not required to credit the testimony of Mr. Roach, Mrs. Roach, or any of their witnesses.

The Defendants submitted substantial evidence showing that the Roaches were not near the initial explosion at Dixie Gas, and that their claimed injuries were either fabricated, exaggerated, preexisting, or not caused by the explosion. Several fact witnesses indicated that Mr. and Mrs. Roach were not on or near the Dixie Gas property at the time the first explosion occurred: Mr. Baker spoke to Mr. and Mrs. Roach minutes before the first explosion as they

were running away; Ms. Gomez testified that she and the Roaches began to leave the Dixie Gas property at the same time, and that the fire department showed up a few minutes later; Mr. Williams testified that he saw Mr. and Mrs. Roach run away from Dixie Gas minutes before the first explosion; and Andy Williams testified that he saw Mr. and Mrs. Roach run through the Dixie Gas entrance gate minutes before the first explosion. Several firefighters testified that they arrived at Dixie Gas and were parked at the entrance gate before the first explosion, that they did not see Mr. and Mrs. Roach leave, and that they took measures to ensure that the area was cleared of any bystanders before the explosion. The jury was entitled to credit this testimony and conclude that, contrary to their assertion, Mr. and Mrs. Roach in fact had left the Dixie Gas property minutes before the first explosion occurred.

The Roaches' expert witnesses testified that the Roaches suffered from tinnitus, hearing loss, PTSD, depression, vocal pattern disorder, and other injuries that were caused by the explosion. However, the trier of fact is not bound to accept an expert witness's testimony as true, and it may reject any expert testimony that it finds to be inconsistent with the credited evidence or is otherwise unreasonable. *Dickey v. McCord*, 63 S.W.3d 714, 720-21 (Tenn. Ct. App. 2001).

The medical evidence submitted by Mr. and Mrs. Roach was directly rebutted by the testimony of the Defendants' experts, Dr. Schwaber, Dr. Wolters, and Dr. Roper. Dr. Wolters and Dr. Roper stated outright that Mr. and Mrs. Roach were exaggerating their emotional and physical injuries. They also concluded that the vocal abnormality displayed by Mr. Roach was not caused by any neurological disorder, but was, at least in part, purposeful, fabricated, or exaggerated. The evidence at trial, including the medical records of Plaintiffs' expert Dr. Shea, indicated that both Mr. and Mrs. Roach had some hearing loss before the Dixie Gas incident, suggesting that their tinnitus and gradual hearing loss was not caused by the explosion. The jury was entitled to credit this evidence as well.

Moreover, it is undisputed that Mr. and Mrs. Roach did not seek medical attention for their claimed injuries until six to eight weeks after the Dixie Gas incident; from this the jury could conclude that the severity of their injuries was exaggerated. Even after they sought medical attention, most of the injuries they claimed were based on subjective complaints that could not be physically verified. In its role as fact-finder, it is the duty and prerogative of the jury to assess the credibility of the witnesses, and the jury was at liberty to either believe or disbelieve the subjective complaints of Mr. and Mrs. Roach. *See Gibson v. Francis*, No. E2003-02226-COA-R3-CV, 2004 WL 1488541, at *4 (Tenn. Ct. App. June 30, 2004).

The parties in this case presented sharply contrasting evidence of the circumstances surrounding the Dixie Gas incident and of the damages caused, or not caused, by the explosion. At trial, the jury was entitled to disbelieve Mr. and Mrs. Roach and their experts,

and to credit the evidence submitted by the Defendants. From our careful review of all of the evidence submitted at trial, we find ample evidence to support the jury's verdict of zero damages.

**Motion for a New Trial**

Finally, the Roaches argue that the trial court erred in declining to grant their motion for a new trial. They note that the order denying the motion for a new trial did not explain the trial court's decision; it simply stated that the motion was denied. From this, the Roaches argue that the order did not establish that the trial court carried out its duty as thirteenth juror to consider whether the preponderance of the evidence weighed against the jury verdict.

When a motion for a new trial is filed, the trial court is under a duty to act as the "thirteenth juror" and independently weigh the evidence and determine whether the evidence preponderates in favor of or against the verdict. *Cooper v. Tabb*, 347 S.W.3d 207, 220 (Tenn. Ct. App. 2010); *Woods v. Herman Walldorf & Co.*, 26 S.W.3d 868, 873 (Tenn. Ct. App. 1999). If the trial court has misconceived its duty or has not fulfilled it, this Court must reverse and remand for a new trial, notwithstanding the existence of material evidence to support the verdict. *Shivers v. Ramsey*, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996). If, however, the trial court fulfilled its duty to act as the "thirteenth juror," it is given wide latitude in deciding a motion for a new trial; its decision in this regard will not be overturned on appeal absent an abuse of the trial court's discretion. *Loeffler v. Kjellgren*, 884 S.W.2d 463, 468 (Tenn. Ct. App. 1994).

In *Cooper*, this Court held: "In addressing a motion for a new trial, the trial court has such broad discretion that it is not bound to give reasons for its action in granting or denying a new trial based on the preponderance of the evidence." *Cooper*, 347 S.W.3d at 221. In fact, "when a trial judge approves the verdict without comment, the appellate court will presume that the trial judge has adequately performed his function as the thirteenth juror." *Id.* In the case at bar, the order denying the motion for a new trial states that it was rendered "after having considered the briefs and other filings and arguments made by each party."[19] We find nothing in the record indicating that the trial judge misconceived his duty or clearly did not follow it. *Id.* at 222. Therefore, we affirm the trial court's denial of the Roaches' motion for a new trial.

---

[19]The trial court held a hearing on the Plaintiffs' motion for a new trial. A transcript of that hearing is not included in the appellate record.

## CONCLUSION

In sum, we conclude that the trial court did not err in granting the Defendants' Rule 35 motion to compel the Roaches to submit to examination by the defense experts, Dr. Wolters and Dr. Roper, and it did not abuse its discretion in allowing the testimony of Dr. Schwaber. Furthermore, the trial court did not abuse its discretion in allowing Mr. Baker to testify by deposition in lieu of appearing in person to testify at trial. We affirm the trial court's decision to deny the Roaches' motion for a new trial and to approve the jury verdict, because material evidence supported the verdict, and the record does not indicate that the trial court abdicated its responsibility to weigh the evidence as thirteenth juror.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellants Charles and Joyce Roach, and their surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE