# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
April 15, 2013 Session

## LORI K. WILHOIT ET AL. v. JOSHUA ANDREW ROGERS ET AL.

**Appeal from the Circuit Court for Washington County**
**No. 26799      Thomas J. Seeley, Jr., Judge**

---

**No. E2012-00751-COA-R3-CV-FILED-JULY 12, 2013**

---

This case involves an automobile accident wherein a refrigerator being hauled by Defendants fell from a truck and collided with Plaintiffs' vehicle. Plaintiff, Lori K. Wilhoit, was driving the vehicle and filed suit regarding her personal injuries and the property damage to her vehicle. Her husband, Jeffrey Wilhoit, also asserted claims regarding property damage to the vehicle and loss of consortium with and services of his wife. A jury trial was held in November and December 2011. As the matter of liability was stipulated, the only issues submitted to the jury related to the amount of damages, if any, suffered by Plaintiffs. The jury returned a verdict awarding Plaintiffs $3,200 for property damage and zero damages for all other claimed injuries. Plaintiffs have appealed. We affirm the jury's verdict regarding property damage and Mr. Wilhoit's claims, but we reverse in part the jury's verdict regarding a portion of Ms. Wilhoit's injuries and medical expenses. We remand this case for further proceedings regarding Ms. Wilhoit's damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Aleania Smith and Howell H. Sherrod, Johnson City, Tennessee, for the appellants, Lori and Jeffrey Wilhoit.

James E. Rasnic, Bristol, Virginia, for the appellees, Joshua Andrew Rogers and Englewood Lawn & Landscape, LLC.

# OPINION

## I. Factual and Procedural History

Plaintiffs filed a complaint on April 4, 2008, which contained, *inter alia*, the following assertions:  on January 8, 2008, Ms. Wilhoit was driving her 1995 Subaru in a southerly direction on Oakland Avenue in Washington County.  Defendant, Joshua Andrew Rogers, was driving a truck owned by Defendant, Englewood Lawn & Landscape, LLC, in a northerly direction on Oakland Avenue.  Mr. Rogers was hauling an unsecured refrigerator in the back of the truck, and as he rounded a curve, the refrigerator fell off the truck and collided with Ms. Wilhoit's vehicle.

Plaintiffs further asserted that Defendants were grossly negligent because of their failure to properly secure the refrigerator before transporting it.  Plaintiffs alleged that as a result of the accident, their vehicle was a total loss.  Ms. Wilhoit claimed to have been injured in the accident and stated that she required medical care resulting in significant expense. Ms. Wilhoit also claimed to have sustained pain and suffering, permanent injuries and disability, and loss of enjoyment of life.  Mr. Wilhoit asserted that he had suffered from the loss of consortium with and services of his wife. Plaintiffs initially demanded damages, both compensatory and punitive, in the total amount of $525,000.  The Wilhoits were later allowed to amend their *ad damnum* clause to increase the amount of damages sought to $4,000,000.

A jury trial was held November 28, 2011, through December 1, 2011.  Defendants stipulated that they were negligent in failing to properly secure the refrigerator but disputed Plaintiffs' claims of personal injuries and property damage.  At the close of Plaintiffs' proof, Defendants moved for a directed verdict on the issue of punitive damages.  The trial court granted this motion, finding no proof that the conduct of Defendants was reckless.  Thus, the remaining issues submitted to the jury were:

1.  The amount of damages, if any, attributable to injuries suffered by Ms. Wilhoit for:

    A.  pain and suffering (past and future),
    B.  loss of enjoyment of life (past and future),
    C.  permanent injury or disfigurement,
    D.  loss of earning capacity, and
    E.  medical expenses (past and future).

2.  The amount of damages, if any, in favor of Mr. Wilhoit for loss of services,

companionship, love and affection of his wife (past and future).

3. The amount of damages to the Wilhoits' vehicle.

After the jury was charged with respective instructions, the jurors deliberated for a short time before returning with their verdict. The only award granted to Plaintiffs by the jury was $3,200 for the property damage to their automobile. The jury returned a verdict of zero damages on all other claims. Plaintiffs filed a motion for judgment notwithstanding the verdict pursuant to Tennessee Rule of Civil Procedure 50.02, a motion to amend the judgment pursuant to Tennessee Rule of Civil Procedure 59.04, and a motion for a new trial pursuant to Tennessee Rule of Civil Procedure 59.06-07 and/or for an additur to the jury's award. The trial court denied Plaintiffs' post-trial motions because the trial court found, based upon an independent review of the evidence, that Plaintiffs were not credible and that the evidence preponderated in favor of the jury's verdict. Plaintiffs timely appealed.

## II. Issues Presented

Plaintiffs present the following issues for our review, which we have slightly restated:

1.      Whether the jury's award of a lesser amount of damages to Plaintiffs for their vehicle than the diminution in fair market value shown by the evidence was proper.

2.      Whether the jury can award zero damages to Plaintiffs in a personal injury case in which liability of the Defendants is acknowledged and stipulated, and the medical proof before the court confirms that Ms. Wilhoit experienced at least some injury.

3.      Whether the trial judge, sitting as thirteenth juror, may deny a motion for additur, motion for judgment notwithstanding the verdict, motion to alter or amend, and/or motion for new trial when the jury fails to award any damages for medical expenses or personal injuries proven beyond a preponderance of the evidence.

## III. Standard of Review

This Court has previously elucidated the proper standard of review regarding an appeal of a jury's verdict:

When reviewing an appeal from a jury trial, we will not set aside the jury's

findings of fact unless there is no material evidence to support them. *Goodale v. Langenberg*, 243 S.W.3d 575, 583 (Tenn. Ct. App. 2007); Tenn. R. App. P. 13(d). This Court will not re-weigh the evidence, but will take the strongest view possible of the evidence in favor of the prevailing party, discarding evidence to the contrary and allowing all reasonable inferences to uphold the jury's verdict. *Id.* A jury verdict will be set aside only if there is no material evidence to support it. *Id.*

*Watson v. Payne*, 359 S.W.3d 166, 168 (Tenn. Ct. App. 2011). Our Supreme Court has more succinctly explained this standard:

[O]ur review is limited to a determination of whether material evidence can be found in the record that would support [the jury's award] as being at or above the lower limit of the range of reasonableness, giving full faith and credit to all of the evidence that tends to support that amount.

*Poole v. Kroger Co.*, 604 S.W.2d 52, 54-55 (Tenn. 1980).

## IV. Property Damage

Plaintiffs assert that the jury's award of $3,200 for damage to their vehicle was insufficient because the proper measure of damages should have been the difference between the fair market value of the vehicle before the accident and the fair market value of the vehicle after the accident. Plaintiffs point out that Mr. Wilhoit's testimony was the only proof presented on the issue of the value of damage to the vehicle. He testified that the vehicle was worth $5,500-6,000 before the accident and had no value following the accident.

Mr. Wilhoit also testified, however, that he had obtained a "preliminary" estimate of $3,200 to repair the vehicle. He then qualified his testimony by stating that this was "just an estimate that they take initially, and once they begin to repair the car, they find more damage, and the estimate always increases." Mr. Wilhoit did not obtain any other estimates and had not sought to have the car repaired by the time of trial. Defendants assert that in the absence of proof that Plaintiffs' vehicle was not capable of being repaired, the proper measure of damages should be the cost of repair plus loss of use, rather than the diminution in the fair market value of the vehicle. *See Tire Shredders, Inc. v. ERM-N. Cent., Inc.*, 15 S.W.3d 849, 855 (Tenn. Ct. App. 1999) ("[I]f the plaintiff's property is capable of being repaired, the measure of damages is the cost of repair plus loss of use, rather than the diminution in value of the property.").

We agree with Defendants' position. Mr. Wilhoit testified that he obtained an

-4-

estimate of $3,200 to repair the vehicle, and although he believed that the repairs would actually cost more, he presented no other proof regarding repair cost. More importantly, Mr. Wilhoit never testified that the vehicle could not be repaired. Absent such proof, the jury was justified in relying on Mr. Wilhoit's testimony regarding the cost to repair the vehicle in awarding damages. We determine that the jury's award was appropriately within the range of reasonableness. As there was material evidence to support the jury's award of $3,200 for the damage to Plaintiffs' vehicle, the verdict must be upheld.

## V. Personal Injuries

Plaintiffs contend that in an action such as this, wherein liability of the Defendants is acknowledged and stipulated, and the medical proof before the court confirms that Ms. Wilhoit experienced at least some injury, the trier of fact cannot ignore expert proof on this issue and award zero damages to Plaintiffs. We agree. *See Fuller v. Speight*, 571 S.W.2d 840, 841 (Tenn. Ct. App. 1978).

Ms. Wilhoit claims that she suffered four different types of physical or psychological injuries as a result of this accident: (1) neurological issues, including headaches, right arm tremor, and bilateral benign paroxysmal positional vertigo ("BPPV"); (2) jaw joint pain and other issues with her temporomandibular joint ("TMJ"); (3) depression, anxiety, and post-traumatic stress disorder ("PTSD"); and (4) injury to her breasts, causing rupture of the encapsulation surrounding her silicone breast implants. We will address each of these categories of claimed injuries in turn.

### A. Neurological Injuries

Ms. Wilhoit testified that she began to experience headaches and nausea in the days following the accident and developed a tremor in her right arm on the fifth day after the accident. She was alarmed by the tremor and called her primary care physician, Dr. Lisa Broyles. An appointment was scheduled for the following day. Dr. Broyles referred Ms. Wilhoit to a neurologist, Dr. Jonathan Turoff.

Dr. Turoff examined Ms. Wilhoit on January 30, 2008, and ordered a magnetic resonance imaging test ("MRI") of her brain. Dr. Turoff explained that the MRI did not reveal any issues related to the accident. Dr. Turoff diagnosed Ms. Wilhoit's tremor as a psychogenic, stress- or anxiety-related tremor, which he opined had developed in the aftermath of the accident. He prescribed various medications to treat the tremor, but the condition did not abate. Dr. Turoff eventually recommended that Ms. Wilhoit consult with a psychiatrist regarding the tremor, stating that he believed an anti-depressant medication might be of assistance.

Dr. Turoff testified that Ms. Wilhoit also reported experiencing dizziness. He ultimately provided a diagnosis of BPPV, which he stated was a common cause of dizziness. As Dr. Turoff explained, BPPV can develop with or without head trauma. In his opinion, Ms. Wilhoit's condition developed as a result of head trauma which she might have sustained in the accident.

Upon Defendants' request, Ms. Wilhoit was examined by Dr. James Brasfield, a neurosurgeon. Dr. Brasfield testified that Ms. Wilhoit told him she did not strike her head during the accident, with the exception of hitting the headrest behind her. Dr. Brasfield noted that Ms. Wilhoit also told him she lost consciousness after the impact, but he considered this claim curious because she only struck the headrest and remained in control of her vehicle. Dr. Brasfield explained that classifying Ms. Wilhoit's tremor as psychogenic was simply a polite means of indicating that there was no medical basis for it. Dr. Brasfield opined that the tremor was not related to the accident and also not related to anxiety; otherwise, it would appear throughout the body. Dr. Brasfield related that when he engaged Ms. Wilhoit in conversation and eye-to-eye contact, or directed her to perform physical tests, the tremor subsided. In his opinion, if the tremor were related to a brain injury, distracting the patient would not cause it to cease.

Defendants also requested that Ms. Wilhoit be examined by Dr. Paul Kelley, a psychiatrist and assistant professor of psychiatry at East Tennessee State University. Dr. Kelley testified that there was strong evidence of malingering regarding Ms. Wilhoit's tremor activity. Dr. Kelley also stated that a psychogenic tremor was simply a tremor with no clear cause. As he explained, a psychogenic tremor was either produced purposefully or was caused by an "hysterical conversion," which is an unusual situation wherein the subconscious mind affects a person's behavior. Dr. Kelley stated that a tremor caused by hysterical conversion would usually persist only two to three weeks and would present differently than Ms. Wilhoit's tremor. When Dr. Kelley employed various tactics to distract Ms. Wilhoit, her tremor would stop, which indicated to him the condition was "fake."

Regarding the BPPV, Dr. Brasfield explained that with cases of severe head injury, patients could sometimes experience dizziness. As he opined, however, Ms. Wilhoit did not sustain a severe head injury. Dr. Brasfield indicated Ms. Wilhoit's dizziness was incongruent with a severe head injury because it occurred inconsistently and was not accompanied by nausea or vomiting. Dr. Brasfield also explained that the diagnostic tests indicated no brain injury. Dr. Brasfield opined that Ms. Wilhoit's complaints of dizziness and problems with depth perception were more likely the result of an ophthalmological issue. According to Dr. Brasfield, Ms. Wilhoit's dizziness was unrelated to the accident. He further testified that he saw no evidence of any type of head trauma or neurological condition as a result of the accident.

As previously explained, this Court cannot re-weigh the evidence but must take the strongest view possible of the evidence in favor of Defendants, discarding evidence to the contrary and allowing all reasonable inferences to uphold the jury's verdict. *See Watson*, 359 S.W.3d at 168. Based on the testimony detailed above, we conclude that there was material evidence to support the jury's verdict that Ms. Wilhoit receive no award of damages for these claimed neurological injuries.

### B.  Jaw/TMJ Injuries

Ms. Wilhoit claimed that approximately two weeks following the accident, she began to experience pain in her jaw and heard a "clicking" sound emanating from the joint when she opened her mouth. She also noticed soreness and sensitivity in her teeth. Ms. Wilhoit consulted Dr. George Karnes, a dentist who specializes in the treatment of TMJ issues. Dr. Karnes testified that Ms. Wilhoit presented arthritis or joint inflammation, joint pain, muscle pain, adhesions, dislocation of the articular disc with reduction periodically, and perforation of the retrodiscal tissue of the left TMJ. Dr. Karnes noted that Ms. Wilhoit had been bruxing (clenching or grinding) her teeth and that her mandible was asymmetrical. He recommended physical therapy to reduce the inflammation and pain of both temporomandibular joints, as well as the use of orthotic devices to correct her bite until the inflammation was reduced.

Dr. Karnes opined that all of Ms. Wilhoit's TMJ problems were caused by the accident but admitted that his opinion was based on the medical history she had provided. As Dr. Karnes explained, Ms. Wilhoit represented that she was "knocked out" in the accident, that she had struck her head and neck, and that the car was "totaled." Dr. Karnes testified that this was the basis for his opinion that the TMJ issues were induced by trauma. Dr. Karnes also addressed Ms. Wilhoit's claim that she had begun clenching her teeth in February 2008 (a few weeks after the accident) and stated that this was a symptom of TMJ problems, which he attributed to the accident. Admittedly, Dr. Karnes had never reviewed Ms. Wilhoit's prior dental records. When presented those records, he acknowledged that complaints Ms. Wilhoit had made to her dentist of clenching in July 2006 and October 2007, prior to the accident, were inconsistent with the history she had provided upon the date of his examination. Dr. Karnes also admitted that a diagnostic test performed on Ms. Wilhoit's temporomandibular joints in June 2009 was found by the radiologist to be unremarkable, although Dr. Karnes disagreed.

During her testimony, Ms. Wilhoit admitted she experienced problems with clenching her teeth while working years before the accident. Ms. Wilhoit stated her dentist filed her back teeth to an extent that they would not touch. She did not have problems thereafter until the accident. According to Ms. Wilhoit, she had been involved in a prior car accident in 1998, at which time she suffered injuries to her neck and back. She suggested, however, that

these injuries were muscular in nature. Ms. Wilhoit admitted she did not remember hitting her head in the 2008 accident. She conceded that the history provided to Dr. Karnes was incorrect and/or incomplete.

Again, we must take the strongest legitimate view of the evidence in favor of Defendants, discarding evidence to the contrary and allowing all reasonable inferences to uphold the jury's verdict. *See Watson*, 359 S.W.3d at 168. Dr. Karnes stated that his opinion regarding the origin of Ms. Wilhoit's TMJ problems was based solely on her subjective complaints and the history she provided. That history was proven to be inaccurate, and the jury had the prerogative to assess Ms. Wilhoit's credibility and determine whether there existed an adequate basis for the health care provider's diagnosis when that determination was based solely on subjective information. *See, e.g., Roach v. Dixie Gas Co.*, 371 S.W.3d 127, 150-151 (Tenn. Ct. App. 2011). Based on the testimony detailed above, there was material evidence to support the jury's verdict that Ms. Wilhoit should receive no compensatory damages for these claimed injuries.

## C. Psychological Injury

Ms. Wilhoit also claimed that after the accident she was depressed, cried often, and sometimes spent the entire day in bed. She was unable to focus on her work and eventually had to close her small graphic design business. She further suffered stress, anxiety, and insomnia. Dr. Broyles testified that she observed evidence of anguish, distress, and fear in Ms. Wilhoit that she had not seen before the accident. Ms. Wilhoit sought treatment from Dr. Nancy Lanthorn, a licensed clinical psychologist.

Dr. Lanthorn testified that Ms. Wilhoit indicated experiencing terror at the time of the accident, believing she was going to die. Ms. Wilhoit reported that following the accident she had difficulty concentrating, which caused an inability to complete her work. Ms. Wilhoit claimed she was no longer able to drive due to vertigo. As a result, she had withdrawn completely and maintained no social life. She also reported she was unable to participate in hobbies or activities that she previously enjoyed.

Dr. Lanthorn diagnosed Ms. Wilhoit with dysthymic disorder (depression) and PTSD, which she opined were directly related to the accident. Based on multiple tests performed, Dr. Lanthorn concluded that Ms. Wilhoit was not malingering. Dr. Lanthorn testified that in her professional opinion, Ms. Wilhoit's psychological concerns stemmed from the accident because Ms. Wilhoit did not report having experienced any such problems before the accident.

Dr. Kelley, Defendants' psychiatric expert, testified that Ms. Wilhoit did not meet the

criteria for a PTSD diagnosis. He stated that the first requirement was a showing of severe trauma and that this type of trauma experience would have to be "extraordinary," such as war, rape, or assault; he opined that an occurrence such as a car accident was not severe trauma. He also related that because Ms. Wilhoit did not remember the impact and because she did not seek psychiatric care during the three years following the accident, her trauma therefrom would not be considered severe. Dr. Kelley further explained that PTSD patients have difficulty discussing the trauma and seek to avoid the subject. Ms. Wilhoit conversed about the car accident "readily and easily," appearing eager to recount it. Dr. Kelley opined that Ms. Wilhoit simply did not meet the criteria for a patient suffering from PTSD. He therefore disagreed with Dr. Lanthorn's diagnosis.

According to Dr. Kelley, Ms. Wilhoit presented evidence of malingering, although he did not perform any tests to determine same. Dr. Kelley stated that he based this opinion on his observations of Ms. Wilhoit as well as her inconsistent actions and statements. Dr. Kelley opined that he did believe Ms. Wilhoit presented a dysthymic condition and that her use of anti-depressant medication was appropriate.

Viewing the evidence in accordance with previously stated principles, we find that there was material evidence to support the jury's award of zero damages for the claimed psychological injuries and PTSD in all respects save one. Accordingly, the portion of Ms. Wilhoit's claimed psychological distress related to the breast injury sustained in the accident is discussed more fully below.

## D. Breast Injury

The remaining injury Ms. Wilhoit claimed to have sustained in this accident was an injury to her breasts. The evidence reflects that Ms. Wilhoit had silicone breast implants surgically placed in 1981. In November 2007, some two months prior to the accident, Dr. Broyles performed a breast examination of Ms. Wilhoit, describing the results as normal with no irregularities. Ms. Wilhoit subsequently underwent a mammogram in December 2007, which presented no abnormal findings.

A few weeks after the accident, Ms. Wilhoit began to notice that her left breast had an area that felt "softer" and began to develop both a small "bubble" and a rash. Ms. Wilhoit scheduled an appointment with a plastic surgeon, Dr. Charles Foley, for March 4, 2008. After examining Ms. Wilhoit, Dr. Foley referred her for an MRI diagnostic test. Ms. Wilhoit testified that she previously had no trouble with her breast implants and that her breasts prior to the accident felt firm from the scar tissue surrounding the implants.

The MRI demonstrated that not only were Ms. Wilhoit's breast implants ruptured, but

the scar tissue encapsulation around the implants had ruptured as well. As a result, the silicone from inside the breast implants had begun to leak into the surrounding fat and tissues, causing an inflammatory reaction. Dr. Foley informed Ms. Wilhoit that the implants and silicone needed to be surgically removed as soon as possible. The record indicates that Ms. Wilhoit did not have surgery immediately due to financial reasons.

Dr. Broyles examined Ms. Wilhoit again on March 26, 2008, when Ms. Wilhoit told her of the visit to Dr. Foley and the MRI results. Dr. Broyles examined Ms. Wilhoit's breasts and found them to be asymmetrical, misshapen, and tender. According to Dr. Broyles, it was "obvious" that the capsules had ruptured. Dr. Broyles explained that before the accident, Ms. Wilhoit's breasts felt like "ceramic bowls" but that following the accident, they were lumpy and irregular.

Both Dr. Broyles and Dr. Foley explained that after a breast implant is inserted, the body forms a capsule of scar tissue around the implant, such that if a silicone breast implant ruptures and begins to leak, the silicone normally remains inside that encapsulation. This is because the silicone is too thick to penetrate the capsule. Dr. Foley related that it was not uncommon for him to encounter patients with ruptured silicone breast implants who were asymptomatic because the silicone was contained within the encapsulation. He further explained that it was only when the encapsulation ruptured and the silicone migrated into surrounding tissues that the inflammatory reaction would occur, causing the symptoms Ms. Wilhoit experienced following the accident.

Both Dr. Broyles and Dr. Foley testified that a direct trauma of some kind would be required to cause the encapsulation surrounding the breast implant to rupture. They agreed that in Ms. Wilhoit's situation, the accident must have caused the encapsulation to rupture because it was the only trauma that Ms. Wilhoit experienced in the relevant time frame. Dr. Broyles related that silicone is a thick substance that travels very slowly, thus explaining why Ms. Wilhoit did not detect symptoms of an injury to her breasts during the few weeks following the accident.

Both doctors indicated that they could not determine with certainty when the implants themselves ruptured, as Ms. Wilhoit would likely not have experienced any symptoms so long as the encapsulation remained intact. Dr. Foley testified that implants of this type generally maintain a life span of fifteen to twenty years. After that period, rupture is possible, and the implants would have to be removed. Both doctors also testified that a mammogram does not always detect an implant rupture, which explains why the MRI test was necessary in this case. Both experts related that Ms. Wilhoit's inflammatory reaction eventually became so severe that infection developed, as well as an eruption through the skin. Dr. Foley ultimately removed the implants, silicone, and scar tissue in his office using only

local anesthesia, a process Ms. Wilhoit described as extremely painful. Following the procedure, as Dr. Broyles and Ms. Wilhoit each related, her breasts appeared scarred, disfigured, and misshapen.

According to Ms. Wilhoit, she developed an autoimmune condition following the accident. She feels great shame and humiliation from this entire situation. She testified that at the time of trial her breasts were still painful and that she did not have normal sensation. Due to the appearance of her breasts, she would not allow her husband to view them. Ms. Wilhoit also expressed humiliation in having to produce pictures of her breasts in court. She confirmed having no problems with her breasts before the accident, and suffering no other trauma within the time frame respective to the accident.

Defendants focused significant attention at trial on whether the impact involved in this accident was sufficient to cause the injury to Ms. Wilhoit's breasts. The parties employed opposing experts in accident reconstruction to testify as to the degree of force involved. Although the expert opinions differed greatly, Defendants' expert admitted that Ms. Wilhoit obviously encountered some type of force from the impact and/or the locking of her seatbelt, however slight that force might have been. Defendants' expert also admitted that he held no opinion on whether the force was sufficient to rupture the encapsulation around Ms. Wilhoit's breast implants, as he did not know what amount of force the encapsulation could withstand before rupturing.

The undisputed evidence was that Ms. Wilhoit was involved in a collision with a 200-pound refrigerator while her car was traveling at approximately thirty miles per hour. Ms. Wilhoit testified that she applied the brakes when she saw the refrigerator approaching. Both accident reconstruction experts indicated that her seatbelt would likely have been in a locked position. As they explained, this occurrence would produce some amount of force on the area of Ms. Wilhoit's breasts, especially upon impact between the vehicle and the refrigerator. There was no history of Ms. Wilhoit having any symptoms of an encapsulation rupture before the accident. Dr. Broyles and Ms. Wilhoit testified that her breasts, upon examination, were notably different in the weeks after the accident than before.

When pressed regarding his opinion that the accident caused rupture of the encapsulation around Ms. Wilhoit's breast implants, Dr. Foley stated, "Is the trauma of that kind of an accident significant enough to tear the capsule and allow the silicone to leak in the fat? The answer is yes, that can happen. I've seen trauma like that happen before, although not with a car wreck." He also opined that, based on his experience with other patients, it was unlikely that Ms. Wilhoit would have experienced the implant problems she did absent the accident occurring. All of the testimony regarding Ms. Wilhoit's breast injury is undisputed. Dr. Brasfield, the neurosurgeon employed by Defendants, testified that he could

not say that Ms. Wilhoit suffered no injury to her breasts, stating that he would defer to Dr. Foley regarding that issue. After thoroughly considering the expert testimony, as detailed above, we conclude that Plaintiffs met their burden of proving that Ms. Wilhoit sustained an injury to her breasts as a result of the accident.

It is well settled that a jury is not justified in ignoring the "unimpeached, uncontradicted testimony of a physician in respect to scientific information of which a layman would not be expected to have any reliable knowledge." *Reserve Life Ins. Co. v. Whittemore*, 442 S.W.2d 266, 275 (Tenn. Ct. App. 1969). Defendants, in their brief on appeal, reiterate credibility concerns surrounding the testimony of Ms. Wilhoit. Such concerns do not appear to relate to the breast injury. Defendants point to no refutation of the expert testimony of Dr. Broyles and Dr. Foley regarding the ruptured encapsulation and its cause. In similar personal injury cases where the jury has apparently overlooked or ignored uncontroverted expert proof that an injury was sustained, thereby returning a verdict of zero or other inadequate amount of damages, this Court has determined that the jury's verdict was not supported by material evidence and accordingly remanded the cases for a new trial on the issue of damages only. *See Fuller*, 571 S.W.2d at 841; *Loftis v. Finch*, 491 S.W.2d 370, 377 (Tenn. Ct. App. 1972); *Taylor v. Smith*, No. E2002-01158-COA-R3-CV, 2003 WL 21487112 at *3-4 (Tenn. Ct. App. June 24, 2003); *Dent v. Holt*, No. 01-A-01-9302-CV-00072, 1994 WL 440916 at *2-3 (Tenn. Ct. App. Aug. 17, 1994). As in *Dent*, "[t]he discrepancy between [the plaintiff's] proof of damages and the jury's verdict stands forth like a beacon in this case." 1994 WL 440916 at *2.

As explained in *Watson* and in this Court's earlier opinion in *Newsom v. Markus*, 588 S.W.2d 883, 887 (Tenn. Ct. App. 1979), "a party is entitled to recover reasonable medical expenses for examinations, etc., in an effort to determine if personal injuries were sustained as a result of defendant's negligence, even though it develops that the party suffered no personal injury." *Watson*, 359 S.W.3d at 170. In *Watson*, as in the case at bar, there occurred an automobile accident wherein the defendant admitted fault, and a trial was conducted only on the issue of damages. *Id.* at 166. The jury awarded the plaintiff zero damages. The plaintiff filed a motion seeking additur or a new trial, which the trial court denied. *Id.* The plaintiff appealed, raising the issue of whether the jury may ignore expert proof and award zero damages where the defendant admitted fault and the only medical proof confirmed that the plaintiff experienced at least some injury. *Id.*

This Court noted in *Watson* that the plaintiff's physician indicated he had treated the plaintiff for a chronic lower back condition before the accident. He had not treated her for head, neck, or shoulder complaints prior to the accident. The physician testified that he had referred her for MRI tests and CT scans to ensure there were no fractures or other problems. The defendant's expert opined that the plaintiff's problems resulted from degenerative

-12-

conditions that one would expect for a person her age rather than from the accident. He admitted, however, that the MRI and other testing was necessary and reasonable to evaluate the patient for possible injury. *Id.* at 170.

As this Court explained in *Watson*, appellate courts have no express statutory authority to initiate an additur. Therefore, the "Court's review is limited to whether the record contains material evidence to support an award of $0 'as being at or above the lower limit of the range of reasonableness.'" *Id.* (quoting *Poole*, 604 S.W.2d at 54). This Court further explained that if "we determine that the damage award does not meet this threshold minimum, we must remand the matter to the trial court." *Id.* at 170. The jury's award of zero damages was determined not to be within the range of reasonableness because the evidence "support[ed] an award of damages to [plaintiff] in an amount minimally equal to medical expenses incurred to evaluate her for injuries following the collision." *Id.* Because both medical experts agreed that evaluation expenses were reasonable and necessary, this Court held: "there is no material evidence to support the jury's award of damages in the amount of $0 because it fail[ed] to compensate [plaintiff] for expenses which are unrefuted by the proof." *Id.* at 171. This Court vacated the jury verdict and remanded for further consideration on the issue of damages. *Id.* Therefore, even where it is ultimately shown that a plaintiff suffered no injury, she is entitled to recover reasonable expenses for necessary medical evaluation.

Further, where there is uncontradicted proof that a plaintiff suffered an injury, the jury is not justified in awarding zero damages or any damage award that is below the range of reasonableness. *See Fuller*, 571 S.W.2d at 841; *Loftis*, 491 S.W.2d at 377; *Taylor*, 2003 WL 21487112 at *3-4; *Dent*, 1994 WL 440916 at *2-3. The circumstances in *Loftis* also involved an automobile accident, one quite severe. *See Loftis*, 491 S.W.2d at 370. The plaintiff subsequently complained of pain in her back, neck, and head, with this Court noting, "though duration of such pain may have been somewhat less than that urged by passenger, it was unrealistic and capricious for the jury to refuse to recognize and compensate for pain of some severity and duration as a result of [plaintiff's] experience and injuries." *Id.* at 376.

This Court went further to explain, "[i]n determining if a verdict is within reasonable bounds, it is necessary to consider the nature and extent of the injuries, suffering, expenses, diminution of earning capacity, inflation, high cost of living, age, expectancy of life, and the amounts awarded in similar cases." *Id.* at 377. As this Court also observed, "appellate courts have the authority and duty to set aside inadequate verdicts in proper cases," concluding:

> Whether it be said that there is no evidence to support the verdict, or that the jury overlooked or ignored uncontroverted evidence, or that the jury acted upon a misconception of the evidence or the law, or that the verdict is so

> inconsistent or inadequate or both as to indicate the various forms of improper consideration by the jury, this Court is satisfied that justice was not done, and that the verdicts are not consonant with facts shown by the uncontroverted evidence and the law applicable thereto.
>
> The verdict of $1,500.00 in favor of Mrs. Loftis is less than her proven actual damages and ignores substantial mental and physical suffering necessarily and naturally incident to her proven injuries.

*Id*. This Court thus reversed the damage award and remanded for a new trial on damages. *Id.* at 378.

In *Taylor*, the plaintiff established medical expenses of $14,895. *Taylor*, 2003 WL 21487112 at *3-4. The only expert proof at trial was presented through an orthopedic surgeon who performed arthroscopic surgery on the plaintiff following the accident to repair a tear in her medial meniscus. *Id*. He opined that although the physical condition was pre-existing, it was aggravated by the accident. *Id*. The jury awarded the plaintiff $10,000. *Id.*

This Court disagreed with the award, stating:

> While Dr. Odom testified that the degenerative condition that prompted the surgery on Mrs. Taylor's right knee was not caused by the accident, he was just as adamant that the accident aggravated this pre-existing condition. It goes without saying that aggravation of a pre-existing condition is a compensable element of damages. *See Elrod v. Town of Franklin*, 140 Tenn. 228, 239-42, 204 S.W. 298, 301-02 (1918). No expert testimony was offered by the defense establishing that surgery was not a necessary procedure to address Mrs. Taylor's right knee problem. In fact, there is no serious argument made by the defense as to whether the surgery was performed, whether it was necessary, or whether the accident aggravated a pre-existing condition.
>
> . . .
>
> In the face of undisputed, necessary and reasonable expenses related to the accident of at least $14,895, the jury awarded Mrs. Taylor $10,000. There is no material evidence to support an award less than these two medical bills. While some of the other bills claimed by the Taylors were not tied to the accident by medical proof, it should also be noted that there were still other bills, such as the emergency room treatment, that were essentially undisputed by the defense.

-14-

Finding no material evidence to support an award less than the "hard-core" medical bills, we are compelled by law to vacate the trial court's judgment entered on the jury's award to Mrs. Taylor.

*Id.* at *3-4.

Finally, in *Dent*, where the plaintiff proved that he had incurred medical expenses of $9,657, his physician projected he would incur future medical expenses in excess of $81,000. *Dent*, 1994 WL 440916 at *2. The jury awarded plaintiff $9,657. This Court noted that the plaintiff testified regarding the physical and psychological anguish he had suffered over the loss of a testicle, stating that "the very nature of his injuries resulted in permanent disfigurement and significant pain and suffering." *Id.* at *2. The Court concluded that the jury must have ignored the proof of future medical expenses as well as pain and suffering in making its award, explaining, "[a]ppellate courts may, therefore, infer that a verdict was the result of mistake, misapprehension, oversight, or misconduct such as passion, prejudice or partiality, when the verdict is greatly at variance from the decided weight of the evidence." *Id.* at *2. This Court further explained:

The jury may not arbitrarily eliminate pain from wounds when all human experience would underscore the existence of pain. When it is apparent that the jury, by its verdict, held the defendant responsible for the whole loaf of bread, the jury may not then arbitrarily cut off a portion as it hands the loaf to the plaintiff.

*Id.* at *3. This Court accordingly remanded the case for a new trial on the issue of damages only. *Id.*

In this case, it was undisputed that Ms. Wilhoit suffered an injury in the accident that caused the encapsulation around her breast implants to rupture, allowing silicone to migrate to outside tissues and cause a severe inflammatory reaction. As a result, Ms. Wilhoit suffered pain and disfigurement, and underwent medical examinations, testing, and a painful surgical procedure. She also incurred reasonable and necessary medical expenses related thereto. Despite undisputed expert proof of injury, causation, and harm, however, the jury awarded Ms. Wilhoit absolutely no damages. We conclude that there is no material evidence to support such an award.

Further, Ms. Wilhoit testified that she had suffered not only physical pain, but also significant stress, shame, and humiliation as a result of the injury to her breasts and the ensuing symptoms and treatment. She was embarrassed because of the resulting disfigurement. Her husband corroborated her testimony. Dr. Broyles testified that she had

observed evidence of Ms. Wilhoit's stress and humiliation regarding her breast injury, as did Dr. Lanthorn, the treating psychologist. Dr. Lanthorn testified that Ms. Wilhoit presented negative image concerns by reason of this injury and that this was a traumatic experience for Ms. Wilhoit. Notably, even Defendants' psychiatric expert, Dr. Kelley, admitted that he believed Ms. Wilhoit suffered trauma by reason of her breast injury. Therefore, on the issues of pain and suffering, permanent injury, and loss of enjoyment of life, in addition to medical expenses, there is no material evidence to support the jury's award of zero damages.

Defendants raise various arguments in support of the jury's verdict, which we find unpersuasive. Defendants assert that due to the age of the implants, they well exceeded their life expectancy. As this Court has often stated, "a defendant takes a plaintiff as he finds him. The fact that the party is in a weakened condition at the time of the injury is not a causal defense available to the defendant." *Fuller,* 571 S.W.2d at 841. That the implants themselves might have been ruptured before the accident is not determinative. What is significant, as Drs. Foley and Broyles testified, is that the accident ruptured the encapsulation around the implants, causing the silicone to leak and travel into the surrounding tissues. Such condition caused Ms. Wilhoit to experience the severe inflammatory response, pain and suffering, and ultimate necessity of removing the implants. Defendants also assert the importance of Ms. Wilhoit not detecting a problem with her breasts and seeking medical treatment immediately. Dr. Broyles testified, however, that silicone is thick and moves slowly. Thus, delays in symptom manifestation and Ms. Wilhoit's seeking medical attention are easily explained.

Finally, Defendants contend that Ms. Wilhoit certainly would have felt and known immediately that the encapsulation was torn in the accident, based on testimony regarding the severe pain she experienced when Dr. Foley removed the implants, silicone, and scar tissue under local anesthesia. There exists no expert testimony or other proof in the record to support this assertion. We find Defendants' arguments in this regard without merit.

The facts and holdings of cases upon which Defendants rely are inapposite to this action. Defendants posit that this case closely resembles *Roach*, 371 S.W.3d at 127, inasmuch as both cases involve "conflicting medical evidence" and "fabrication of injuries." This case is distinguishable from *Roach*, however, because Ms. Wilhoit's breast injury was objectively verified and not refuted by any other proof. Defendants' reliance on *Edwards v. McPeake*, No. M2004-00747-COA-R3-CV, 2005 WL 954864 (Tenn. Ct. App. Apr. 25, 2005), is similarly misplaced because in that case, the plaintiff's physician testified that the plaintiff had injuries pre-existing the accident and presented degenerative disc disease that would ultimately have caused the plaintiff to be in the same condition even absent the accident. In the present case, Dr. Foley testified that the accident was the only trauma that Ms. Wilhoit suffered in the relevant time frame sufficient to cause this injury to her breasts.

According to Dr. Foley, but for the accident, Ms. Wilhoit would not have experienced the breast-related problems she did. In light of such proof, the jury's verdict awarding zero damages cannot be upheld, as there is no material evidence to support such an award outside the range of reasonableness.

As we have determined that a remand on the issue of damages is required, we further conclude that our review of Plaintiff's final issue regarding post-trial motions is pretermitted as moot.

## VI. Conclusion

The jury's verdict awarding zero damages for Plaintiffs' claims of personal injury regarding her breasts is vacated, and the case is remanded for further action consistent with this opinion. The jury's verdict is affirmed in all other aspects. Costs on appeal are assessed to the Appellees, Joshua Andrew Rogers and Englewood Lawn & Landscape, LLC.

_____
THOMAS R. FRIERSON, II, JUDGE